GEORGE T. McCARTHY, SR., *vs.* THOMAS H. CLANCY,
CITY SHERIFF, IN MATTER OF HABEAS CORPUS.

Third Judicial District, Bridgeport, October Term, 1929.
WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued November 5th, 1929—decided January 6th, 1930.

486

*William E. Thoms* and *Frank P. McEvoy,* for the plaintiff.

*William H. Comley,* State's Attorney, with whom, on the brief, was *Lorin W. Willis,* Assistant State's Attorney, for the defendant.

MALTBIE, J.  The defendant having made return to the writ of habeas corpus, and issues having been joined, the case comes before us upon a reservation. The questions of law presented for our consideration and advice, principally concern the constitutionality of § 351 of the General Statutes, the authority of the three justices of the peace to act under it and the effect of the proceedings upon the petition for the writ of prohibition.  Section 351 provides as follows: "The grand jurors in each town, or any three of them, or the justices of the peace residing in any town, or any three of said justices may meet to advise concerning offenses committed in such town, and may call before them at such meeting any witnesses to be examined touching the same, and if any person shall refuse to appear before them at such meeting, being summoned by competent authority, said justices, or any one of them, may issue a *capias* to bring such person before them, and said grand jurors may apply to a justice of the peace for a *capias,* who may issue one, to bring such person before said grand jurors; and if any person appearing, or being brought before said justices, shall refuse to be sworn, or being sworn shall refuse to answer any proper question, said justices shall commit him to jail, there to remain at his own expense until he shall give evidence as required; and if any person appearing, or being brought before said grand

jurors, shall refuse to be sworn, or being sworn shall refuse to answer any proper question, said grand jurors may complain to any justice of the peace, in the county where such meeting is had, who shall cause such person to be brought before him and commit him to jail, there to remain at his own expense until he shall give evidence as required. The state's attorney of the county wherein such examination is held and the prosecuting attorney of any town, city, borough or police court within the town may assist and participate therein. Said grand jurors and said justices, when so met, shall have all the powers of a justice of the peace when holding court, to commit for contempt."

Previous to the enactment of Chapter 274 of the Public Acts of 1895 this section of the statutes did not include justices of the peace but provided only for the convening of grand jurors for the purposes specified. Under the statute in that form the question of its constitutionality came before this court in *In re Application of Clark*, 65 Conn. 17, 31 Atl. 522, and in a very able and comprehensive opinion written by HAMERSLEY, J., this court sustained the Act. It would serve no good purpose to review the opinion of the court in that case at length. It answers directly the two claims now most seriously advanced against the validity of the law and, inferentially at least, most of the others. To the claim that by the broad provisions of the Act giving the justices power to commit for a refusal to answer "any proper question" a witness is placed in a position where he may be forced by fear of punishment to give evidence tending to incriminate himself, the court answered by approving a decision of CHIEF JUSTICE STORRS in chambers, that a witness imprisoned for refusal to give evidence which might tend to incriminate him must be discharged upon habeas corpus. That is to say, a witness testifying

before justices convened under the provisions of this statute has the right to refuse to answer any question which would tend to incriminate him. But a mere claim on his part that the evidence will tend to incriminate him is not sufficient. Having made his claim, it is then for the justices to determine in the exercise of a legal discretion whether, from the circumstances of the case and the nature of the evidence which the witness is called upon to give, there is reasonable ground to apprehend danger of criminal liability from his being compelled to answer. That danger "must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice." Cockburn, C. J., in *Regina* v. *Boyes,* 1 B. & S. 311, 330; see also *Brown* v. *Walker,* 161 U. S. 591, 599, 16 Sup. Ct. 644; *Mason* v. *United States,* 244 U. S. 362, 37 Sup. Ct. 621; *State* v. *Thaden,* 43 Minn. 253, 255, 45 N. W. 447; *State* v. *Wood,* 99 Vt. 490, 124 Atl. 697; *Manning* v. *Mercantile Securities Co.,* 242 Ill. 584, 90 N. E. 238; 4 Wigmore

on Evidence (2d Ed.) § 2271. Moreover, a witness called before such a tribunal as that authorized by the statute in question, against whom no accusation or proceeding is pending, could not advance such a claim as a justification for a failure to answer any question whatsoever which might be asked; for rarely would it happen that all the evidence he might give in regard to the matter under investigation would tend to incriminate him. He would have to claim the privilege as to each specific question asked of him and as to each, before he would be justified in refusing to answer, it must appear that there was reasonable ground to apprehend from it some real danger of incrimination. *Eckstein's Petition*, 148 Pa. St. 509, 515, 24 Atl. 63; *Ex parte Stice*, 70 Cal. 51, 53, 11 Pac. 459. The same rules apply with regard to the production of documents. *Manning* v. *Mercantile Securities Co., supra*, 592.

Another ground upon which the claim of unconstitutionality rests is that for the justices summarily to commit a witness who refuses to testify before them is not to afford him that due process of law which is guaranteed to him by our own Constitution and that of the United States. Const. of Conn., Article First, § 9; Const. of U. S., Amendment 14, § 1. In the *Clark* case this claim was also examined at length and found to be without merit. Much of the reasoning of the opinion in that case, we unhesitatingly adopt. It was there pointed out that the procedure established under the law was "a police regulation for the purpose of protecting society against crime by providing efficient means for the discovery of crime and the detection of the criminal"; the fact was emphasized that it is the duty of all good citizens when legally required to do so to testify to any facts within their knowledge affecting public interest and that no one has a natural

right to be protected in his refusal to discharge that duty; and the court described the function of the grand jurors acting under the statute as administrative. But in so far as the opinion in the *Clark* case characterizes the procedure before a justice against a witness who refuses to testify as being of the same nature as that before the grand jurors we are constrained to come to a somewhat different conclusion in the light of the full discussion of similar questions in other courts since that time and particularly in the Supreme Court of the United States, whose word upon this aspect of the question is necessarily final.

In *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 14 Sup. Ct. 1125, the Supreme Court had before it certain provisions of the Interstate Commerce Act which gave the commission broad powers to inquire into the management of the business of all common carriers and to that end to summon witnesses and to require the production of documents, and then provided that any Federal court within the jurisdiction of which an inquiry was being carried on might, where a witness refused to obey a subpoena to appear before the commission, issue an order requiring him to appear and give evidence and in the event of his failure to obey its order might punish him for a contempt of the court. Certain witnesses having appeared before the commission in answer to subpoenas and having refused to produce certain documents demanded by the commission it petitioned a Circuit Court of the United States for an order requiring the witnesses to produce the documents desired and the Circuit Court dismissed the petition upon the ground that the section of law authorizing it to act was unconstitutional as imposing upon the judicial tribunals of the United States duties not judicial in their nature. On appeal the Supreme Court held that this conclusion was not sound. It

stated that the question presented upon such a petition "is substantially, if not precisely," that which would arise if Congress had made it a criminal offense not to appear and give proper testimony before the commission after being duly summoned; that the commission duly presented its petition, asserting its right to have the evidence it sought, and this right the respondents denied; and that thus there arose a dispute involving the rights or claims asserted by the parties to the petition. The court said (p. 477): "It cannot be that the general government, with all the power conferred upon it by the people of the United States, is helpless in such an emergency, and is unable to provide some method, judicial in form, and *direct in its operation,* for the conclusive determination of this dispute." It pointed out that the result would be a final determination of the rights of the parties, enforceable by proper order of the court and conclusive until reversed upon appeal. Again it said (p. 487): "It is none the less the judgment of a judicial tribunal dealing with questions judicial in their nature, and presented in the customary form of judicial proceeding, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in the execution of a power granted by the Constitution." "The inquiry," says the court (p. 485), "whether a witness before the commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment." Similar conclusions have been

reached in later cases in the Supreme Court, even as late as *Old Colony Trust Co.* v. *Commissioner of Internal Revenue*, 279 U. S. 716, 722, 49 Sup. Ct. 499.

In *Matter of Davies*, 168 N. Y. 89, 61 N. E. 118, a somewhat similar question was presented to the Court of Appeals of New York. The controversy arose under a statute designed to prevent monopolies and restraints of trade. This statute authorized the Attorney General of the State, whenever he had determined to commence an action under it to present to any justice of the Supreme Court an application for an order directing such persons as were named in it to appear before the justice or a referee and answer questions and produce documents with reference to any alleged illegal contract, and it was made the duty of the justice to grant the application. Any referee appointed under the Act was given power to punish for contempt a witness duly summoned who failed to appear, testify, or produce the documents called for. An order having been made by a justice of the Supreme Court directing a certain witness to appear before a referee to be examined and to produce certain documents the witness moved to vacate the order and upon the denial of his motion appealed, the substantial ground being that the proceedings were not judicial in their nature. This contention the Court of Appeals held not to be sound. It pointed out that while the statute stated that "it shall be the duty of the justice . . . to grant such application" and "the order shall be granted" by him, these terms were not intended to be mandatory, but he was called upon to exercise a judicial function in determining whether the proceeding was in compliance with the statute and the testimony of the witness would be material and necessary. Not only was this in form a judicial function but the duties imposed upon the justices were of

a judicial character because they were incident to a judicial proceeding. The court, after referring to the fact that a bill of discovery would lie at common law even where there was no action pending at the time it was brought, said (p. 107): "If the courts themselves, simply of their own motion, can establish such a system, cannot the legislature create a procedure similar in nature, even if it is more drastic? It is true that testimony thus taken could be read in evidence on the trial of the other action, but is this essential to a judicial purpose, or does due process of law require that testimony cannot be taken by a judge, unless it is to be read in court, provided the sovereign power needs it in order to enforce its own laws through judicial proceedings? Is the State itself, when a litigant, not to establish a mere right of property, but a cause of public justice, limited by its own Constitution to the procedure that ordinarily prevails in controversies between individuals, or has it the power through its legislature to authorize testimony to be taken in order to aid its Attorney General in attempting to enforce its policy as a political community and to promote the general welfare by proceedings in its courts of justice? Is there no power in government to examine a witness for this purpose? The question is not whether the exercise of the power is wise or discreet, but whether the power exists. We are not called upon to decide whether the thing should be done, but whether it can be done, and care should be taken in making the decision not to hamper the State in the enforcement of law."

When in the light of the very able opinions in these two cases, we turn to our statute as it stood when the *Clark* case was decided we are constrained to think that we failed to distinguish sufficiently the proceedings before a justice of the peace upon application by

the grand jurors for an order of commitment from that before grand jurors themselves. Justices of the peace by our Constitution are a part of the judicial branch of our government. Const. of Conn., Article Fifth, § 2; *Fox* v. *Hoyt,* 12 Conn. 491, 497; *Wooley* v. *Williams,* 105 Conn. 671, 673, 136 Atl. 583. The Constitution provides, in the section referred to, that they shall have "such jurisdiction in civil and criminal cases, as the General Assembly may prescribe." "Case" is here used in a broad sense and includes any proceeding judicial in its nature. It does not matter that the proceeding was begun by an official or officials in the exercise of an administrative capacity if later in the proceedings the judicial power is called upon to exercise a judicial function. In a review of a decision of the United States Board of Tax Appeals in *Old Colony Trust Co.* v. *Commissioner of Internal Revenue,* 279 U. S. 716, 722, 49 Sup. Ct. 499, the court, speaking by Chief Justice Taft, said: "The case is analogous to the suits which are lodged in the Circuit Court of Appeals upon petition or finding of an executive or administrative tribunal. It is not important whether such a proceeding was originally begun by an administrative or executive determination, if when it comes to court, whether legislative or constitutional, it calls for the exercise of only the judicial power of the court upon which jurisdiction has been conferred by law." See also *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 475, 14 Sup. Ct. 1125. It is true that the statute provides that when any person appearing before the grand jurors refuses to be sworn or answer any "proper question" they may complain to a justice of the peace "who shall cause such person to be brought before him and commit him to jail . . . until he shall give evidence as required"; but this provision does not mean that the justice must upon the witness

being brought before him forthwith and without inquiry commit him to jail. It would be for the justice to make inquiry whether or not the persons making the application were grand jurors of the town, whether or not there had been a refusal to be sworn or to testify, whether or not, if the witness refused to answer upon the ground of self-incrimination, that refusal was justified in law; and whether or not, the questions which he refused to answer were proper questions. It is only for a refusal to answer a "proper question" that a witness may be committed and, while this does not require that in making the inquiry the ordinary rules of evidence shall be applied, the question must reasonably pertain to the subject of inquiry, and may not represent what Mr. Justice Holmes characterizes as a mere "fishing expedition"; " a ground must be laid . . . and the demand must be reasonable." *Federal Trade Commission* v. *American Tobacco Co.*, 264 U. S. 298, 306, 44 Sup. Ct. 336; *Ellis* v. *Interstate Commerce Commission*, 237 U. S. 434, 445, 35 Sup. Ct. 645. In determining these matters it would be the duty of the justice to hear the respondent and consider any defense he might offer. In acting upon the application by the grand jurors the justice would be performing a judicial function. It was within the power of the legislature to impose upon him the duty to perform this function. When the respondent has appeared and been heard and has been found to have failed in his duty under the statute, his commitment to jail would not be in violation of due process of law guaranteed by the Federal and State Constitutions.

When in 1895 the statute was amended to provide for an inquiry by justices of the peace as well as one by grand jurors, the procedure to be adopted in case of a refusal of a witness to answer before the latter remained the same but in the case of an inquiry before

justices of the peace it was provided that, upon his refusal to answer a proper question they might themselves commit him to jail. The obvious thought in the mind of the legislature was this: Here are justices of the peace themselves conducting the inquiry; why, in case of a refusal of a witness to answer, make it necessary to institute proceedings before another justice of the peace; why would he be any more competent to exercise the power than the justices before whom the refusal actually took place?' It seems to us that this reasoning is sound. If the committal by one justice on application of the grand jurors is a judicial act, equally so is the committal by three or more justices where the refusal to answer a proper question occurred in their very presence. When sitting as a court, justices have always had the power to commit a witness refusing to answer any proper question in any action pending before them; Niles, Conn. Civil Officer (Ed. 1823) p. 65; a power which in criminal proceedings received statutory recognition as early as 1711. Compiled Statutes of 1808, p. 231. It is well settled that, for a refusal to give testimony properly required of one before a judicial tribunal a witness may be summarily committed without offending against the guarantees of due process of law. *Cooke* v. *United States,* 267 U. S. 517, 534, 45 Sup. Ct. 390; *Ex parte Terry,* 128 U. S. 289, 307, 9 Sup. Ct. 77; *Noell* v. *Bender* (Mo.) 295 S. W. 532.

If then the inquiry is one which justices of the peace may properly be authorized to make, there can be no question of their right to commit a witness refusing to answer a proper question. The office of justice of the peace in this jurisdiction "appears to have been adopted without the authority of any . . . statute and its existence is probably coeval with the Colony." Niles, Conn. Civil Officer (Ed. 1823) p. VI. A justice

of the peace while holding his court "acts as a judicial officer"; and "since the General Assembly has not ordained and established an inferior court whose functions are administered by justices of the peace, no justice court exists except while a justice is holding one." *Alcorn* v. *Fellows*, 102 Conn. 22, 31, 127 Atl. 911. Even in connection with his judicial duties he occupies a dual capacity, judicial when engaged in the disposal of judicial matters, and ministerial when acting as the clerk of the court, keeping its records, and performing like duties. *McVeigh* v. *Ripley*, 77 Conn. 136, 139, 58 Atl. 701; *Wooley* v. *Williams*, 105 Conn. 671, 673, 136 Atl. 583. It is very likely true, that when the justice court is adjourned without day the judicial officer can no longer act. But the ministerial officer remains and may do any act which such an officer can lawfully do. *Smith* v. *Moore*, 38 Conn. 105, 109. From the earliest times powers and duties have been imposed upon justices, when not sitting as a court, of an administrative nature; as to issue warrants to impress workmen to repair bridges; to grant a warrant of distress to collect penalties for neglect to work upon the highways; to appoint overseers of shipbuilding; to summon juries to inquire into sudden deaths; to advise with or act in place of selectmen with reference to regulations concerning dogs; to grant warrants to impress houses and other necessaries for the care of the sick, and to do many other acts of a like nature. See General Statutes, Compilation of 1808, pp. 120, 227, 237, 238, 375, 608, 610. More pertinent to our inquiry are the provisions of the original statute out of which has grown the one now before us. It appears as Chapter 70 of the Acts and Laws of 1731, in the following form: "An Act for Requiring the Justices, Grand Jurors, &c. in every Town in this Colony, to meet together twice in a Year, to advise what may

be most proper to suppress Vice and Immorality. Whereas it is Observed by this Assembly, that many Laws which are in Force in this Colony, for the suppressing of Vice and Immorality, are not duly executed. Be it Enacted by the Governor, Council and Representatives, in General Court Assembled, and by the Authority of the same, That from and after the last Day of December next, All the Justices of the Peace, Grand-Jurors, Constables and Tything-men, in the respective Towns in this Colony, shall Annually Meet in the respective Towns to which they belong, on the First Monday of January, and on the First Monday in June, at the Place where their Annual Town-Meetings are held; or at some Place by them appointed, there to Advise, Consider, and use their Joint-Interest in Suppressing of Vice and Immorality, and the due Execution of all the Laws of this Colony to which their respective Offices have relation." When the Constitution provides for the appointment of justices of the peace, it refers to officers who, when not acting judicially, had been wont to exercise powers of an administrative character. No question has heretofore been raised, so far as we are aware, as to the right of the General Assembly to cast upon justices the power to investigate crimes; nor do we think it open to question. In an administrative capacity, they may pursue the investigation authorized by the statute in question; when confronted with the refusal of a witness to answer, they then are called upon to act in a judicial capacity; in both capacities they exercise a function which the legislature may lawfully impose upon them. It is possible that the performance of the judicial function might be affected to some extent in some instances by the interest aroused through personal participation in the investigation. But the acts of the justices must always be kept within the bounds of

law, else the witness whom they order committed may secure his freedom by the remedy here invoked, the writ of habeas corpus; and we cannot believe that any danger will arise from this source such as would amount to a denial of justice to him. That being so, the question of committing both functions to the same magistrates presents merely a matter for determination by the legislature.

We are asked whether the order of commitment which, in accordance with the terms of the statute, provided that the plaintiff be kept in jail "until he consent to testify his knowledge in the aforesaid matters and be discharged by due course of law," did not violate the Eighth Amendment of the Constitution of the United States. This could not, of course, be so, since, as the Supreme Court of the United States has said, "by the unvarying decisions of this court the first ten Amendments of the Federal Constitution are restrictive only of National action." *Twining* v. *New Jersey*, 211 U. S. 78, 92, 29 Sup. Ct. 14; see also *State* v. *Gaetano*, 96 Conn. 306, 310, 114 Atl. 82. Moreover, it is to be borne in mind that an order of commitment for failure to testify is not a punishment for breach of a criminal law, but is a means adopted by a court to compel obedience to its lawful orders, and its termination may properly be conditioned upon the performance of the act required. *In re Swan*, 150 U. S. 637, 14 Sup. Ct. 225; *Tinsley* v. *Anderson*, 171 U. S. 101, 107, 18 Sup. Ct. 805; *Lester* v. *People*, 150 Ill. 408, 423, 23 N. E. 387, 37 id. 1004; *Lansing* v. *Easton*, 7 Paige Ch. (N. Y.) 364, 367; *Forrest* v. *Price*, 52 N. J. Eq. 16, 29 Atl. 215 (affirmed, 53 N. J. Eq. 693, 35 Atl. 1130); *Kernodle* v. *Cason*, 25 Ind. 362.

We are asked whether the justices have power under the statute in question to make inquiry whether any offense has been committed, particularly in the absence

of a prior finding that such an offense has actually been committed by someone, or of some information or indictment charging a specific crime, or of some pending prosecution. The statute authorizes the justices or grand jurors to meet "to advise concerning offenses committed in such town." We have already quoted the original Act of 1731 out of which the present law grew, directing the law officers of the towns to meet twice a year "to Advise, Consider, and use their Joint-Interest in Suppressing of Vice and Immorality, and the due Execution of all the Laws of this Colony to which their respective Offices have relation." When in 1750 the statute assumed much of its present form, its language was as follows: "The grand jurors in each town, or any three of them, may, if they judge it necessary and proper, meet at such time and places as they shall appoint, to advise concerning such breaches of the law as by their office they are to inquire after and present." This continued to be its phraseology until in the Revision of 1875, it took its present form. It is presumed that the revisers did not then intend to make any substantial change in the law. *Ross* v. *Crofutt*, 84 Conn. 370, 376, 80 Atl. 90. Indeed, of this very statute we said in the *Clark* case (p. 29): "The statute of 1750 has been modified in the process of time, both by changes in phraseology and in the duties of grand jurors and justices; but there has been no change in the purpose of the Act or in the authority for the summary commitment of a witness who refuses to testify." If then we turn back to the statute as it stood before 1875, and follow out its reference to "such breaches of law as by their Offices they [the grand jurors] are to inquire after and present," we find that another provision of the Act of 1750, placed upon them the duty to "diligently inquire after and make due presentment, or complaint, of all crimes and mis-

demeanors which shall come to their knowledge"; and this provision has always remained substantially unchanged. General Statutes, § 348. Read in the light of the history of the provision, the words "to advise concerning offenses committed" are not to be taken as restricting the inquiry to specific charges or accusations of crime. If the grand jurors or justices have reason to apprehend that any kind of offense against the criminal laws has been committed they are authorized to make inquiry as to it. There need be no preliminary finding that a crime has been committed nor any pending accusation against any person as having committed it. To restrict the inquiry as the plaintiff suggests would largely, if not entirely, defeat the very purpose of the statute.

This suggests a question as to the notice of the nature of the proceedings to which a witness is entitled. This question is not presented upon the reservation, no doubt because in the instant case the plaintiff had ample notice from the summons and the newspaper article to which we have referred, but in order to make clear the proper procedure under the statute we consider it. A witness summoned before the examining authorities, before he is called upon to testify, is entitled to reasonable information as to the purpose of the inquiry, for in no other way can his rights be properly protected. If that inquiry concerns a specific offense the commission of which there is reason to suspect, this ought fairly to be suggested to him; if the inquiry is to be broader, he should be advised at least in general terms of its purpose. Reasonable notice to him is the test, having regard to a fair opportunity to him to protect his rights and also to the rights of the public in the discovery and prosecution of crime.

The plaintiff contends that under the charter of the

city of Bridgeport justices of the peace residing therein are forbidden to exercise the powers conferred by the statute. When in 1895 the statute was amended to include justices of the peace, it authorized three or more justices "residing in any town in which a town, city, borough, or police court is established" to act under its provisions. Public Acts of 1895, Chap. 274. This limitation as to the towns in which justices might act is strongly suggestive of the intent of the legislature. In towns where local courts having criminal jurisdiction had been established the power to prosecute was vested in prosecuting attorneys and this function was taken from the grand jurors; indeed, in certain towns where there was a consolidated town and city government grand jurors were not elected at all. The intent of the legislature was plainly to preserve in such cases a method of inquiry as to crime apart from the machinery concerned with the prosecution and punishment of particular offenders. In the same session of the legislature in which this amendment to the statute was made a revision of the charter of the city of Bridgeport was enacted. This established a City Court with civil and criminal jurisdiction and as to the latter provided that it should "have and exercise within the city all jurisdiction, authority, and powers which justices of the peace in the several towns of this State have and exercise in all matters of a criminal nature, and may proceed thereon in the same manner as such justices of the peace may do"; it made no provision for the election of grand jurors but authorized the appointment of a prosecuting attorney and an assistant prosecuting attorney in whom were vested all the powers ordinarily exercised by grand jurors and to whom it specifically gave authority to act under the section of the statutes we are considering. In this last respect the terms of the Act are:

"The provisions of section ninety-one of the general statutes [the statute now in question] are hereby extended to said prosecuting attorney and assistant prosecuting attorney and said special prosecuting attorney, and they shall respectively have all the powers within the limits of the city of Bridgeport that grand jurors have in their several towns by virtue of said section." Special Laws, 1895, p. 549 *et seq*. We cannot read these provisions of the charter as intended to take from justices of the peace residing in the city of Bridgeport the power to act under the provisions of the statute we are considering. We regard it as significant that the power to act under the statute was in terms "extended" to the prosecuting attorneys. As we have pointed out the investigations authorized by it are in the nature of inquisitions for the purpose of determining whether there is a likelihood that a crime has been committed and while incident to the judicial function they are a very different thing from the determination in a court of law of questions as to the guilt or innocence of persons accused of specific crime. They are inquiries designed to be less formal than trials and power to carry them on is imposed in a group of officials not less than three in number. The amendment to the statute did not take away any power from the grand jurors, but only provided an additional and alternative method of inquiry by justices of the peace; hence the power given to prosecuting attorneys by the Bridgeport charter to act under the statute in lieu of the grand jurors cannot be regarded as restricting the power of justices of the peace also to act. It seems to us that the amendment of the statute is to be read in conjunction with provisions of the charter of the city we have referred to, and that there is no conflict between the powers and authority vested in the City

Court by that charter and the general provisions of the statute. We cannot see how the further amendment to the statute striking out the limitation as to the towns in which justices of the peace may act can narrow its scope; Public Acts of 1909, Chap. 112; nor do we find anything in subsequent revisions or amendments to the city charter to affect that result. 15 Special Laws, p. 542; 16 Special Laws, p. 112; 17 Special Laws, p. 1005.

We are asked whether the justices were without jurisdiction to issue the capias and mittimus because of the pendency of the application for a writ of prohibition and the failure of the trial court to take any final action in that proceeding. Of course the pendency of the petition could not destroy the jurisdiction which the justices had under the statute and whether in proceeding in the matter as they did they rendered themselves liable to any penalty by reason of the pendency of the petition is not a question to be determined in this action.

The plaintiff claims to find ground for disqualification of the justices to conduct the inquiry in the statement to the press made by the justice who took the lead in the matter. The statement was manifestly injudicious and if the matter is one likely to involve political considerations a bi-partisan group of justices would have been the best way to avoid criticism, but we cannot find anything in this statement which indicates bias or prejudice or could so affect the impartiality of the investigation as to disqualify the justices to act. We must point out, however, that an inquiry under the provisions of the statute is one which should be made in secret. As was pointed out in the *Clark* case (p. 28) investigations as to crime under this statute are really local inquests of much the same nature as the "grand inquest" by the grand jury called

for the entire county at sessions of the higher courts. Secrecy concerning the conduct of hearings before, as well as concerning the deliberations by, grand juries has always been regarded as essential to the proper conduct of investigations by them. *State* v. *Fasset,* 16 Conn. 457, 467. There are many reasons for this and we mention three which are peculiarly cogent as regards inquiry under the statute. Witnesses will often be more willing to testify freely and to volunteer information in private than they would be in public. To make public the information secured in such an investigation would often afford those guilty of crime the opportunity to escape or to destroy or conceal the necessary means to prove their guilt and thus make it difficult if not impossible to secure conviction. Most important of all, an inquiry under the statute to be effective must often range far and elicit much information which may finally prove to be of no value in any prosecution for crime which may follow; indeed, with all the information before them, the grand jurors or justices conducting the inquiry may conclude that no crime has been committed. It is eminently unjust to require that a witness, who may not be in the least implicated in the matter under investigation, should disclose to the public gaze his private concerns when, as it may ultimately appear, to do so would in no way be of service in the protection of society or the detection or punishment of crime. It is his duty to disclose all matters which may assist the investigators in their inquiry, but, on the other hand, it is his right to be protected from disclosing them to anyone else, except as may be necessary to detect crime or secure the punishment of the criminal. As originally constituted the inquiry was intended to give the grand jurors the necessary information whereby they might as prosecuting officers proceed against those who there

was reason to believe were guilty of crime. As the statute now stands those who conduct the inquiry may not be the ones to prosecute for the offenses disclosed; but the purpose is still the same, to inform and assist those whose duty it is to prosecute. Hence it follows that the justices acting under the statute are in duty bound to report the results of their investigation to the proper prosecuting officer if they conclude that the facts elicited reasonably indicate that a crime has been committed; but beyond that they are just as much bound by secrecy as are grand jurors by the oath they take: "The secrets of the cause, your own, and your fellows', you will duly observe and keep"; General Statutes, § 2201; and by the secrets of the cause is meant "the persons accused, the witnesses, who they are, and what they testified to." *State* v. *Fasset,* 16 Conn. 457, 467.

We have already considered at length the questions propounded in the reservation, but we add, that there may be no misunderstanding, these categorical answers: To questions 1, 2, 4, 5, 7, 8 and 10, we answer, No; to questions 3, 6 and 9, we answer, Yes, as developed in the foregoing opinion.

No costs will be taxed in this court to either party.

In this opinion the other judges concurred.