**UNITED STATES of America,
Appellee,**

v.

**Eloy Joseph ROMERO and Ralph John
Visconti, Defendants-Appellants.**

No. 82, Docket 24687.

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1957.

Decided Nov. 18, 1957.

Robert Mitchell, New York City, for defendants-appellants.

Paul W. Williams, U. S. Atty., Southern District of New York, New York City (Robert Kirtland, Asst. U. S. Atty., New York City, of counsel on the brief), for appellee.

Before CLARK, Circuit Judge, LUMBARD and MOORE, Circuit Judges.

LUMBARD, Circuit Judge.

Appellants seek reversal of a conviction for the sale of narcotics and for conspiracy to violate the federal narcotic laws. They were tried before a jury in the United States District Court for the Southern District of New York, and each was sentenced by Judge Levet to 8 years imprisonment on Count 1 and 5 years on Count 4, to be served concurrently. Count 3, which the Court dismissed at the end of the government's case, by charging that the defendants, being over 18 years of age, had sold heroin to Matthew Ottomano, then under 18, subjected the defendants to a possible death sentence in the discretion of the jury if they were convicted. Narcotic Control Act of 1956, 21 U.S.C.A. § 176b.

Romero and Visconti assign as error the trial judge's questioning of veniremen as to their scruples regarding capital punishment, the court's rejection of a motion to suppress certain evidence claimed to be the product of an illegal search and seizure, and the government's calling a co-conspirator to testify when it allegedly knew he would refuse to testify.

There was ample evidence to support the convictions. On the night of December 3, 1956, Agent Palma of the Bureau of Narcotics met Matthew Ottomano and Anthony Boschetti, both of whom he had met on prior occasions, at about 7:20 P.M. near 117th Street and First Avenue in New York City. After a brief conversation, Ottomano and Boschetti walked west on 117th Street toward Second Avenue, Palma remaining near 326 East 117th Street. Ottomano and Boschetti then proceeded north on Second Avenue for one black and then turned west into 118th Street. During this time they were observed by Agent Coyne who was walking on the opposite side of the street. Upon entering 118th Street, Coyne ran up the stairs of 204 East 118th Street to the roof which was four floors above the street.

Boschetti lingered by the stoop of 209 East 118th Street while Ottomano entered a candy store at No. 205, just a few feet away and almost directly across the street from Coyne's observation post. Lights on 118th Street and on Third Avenue and in the candy store which had a glass front permitted Coyne to observe from the roof what happened below. Ottomano met appellant Romero in the front of the store and immediately thereafter appellant Visconti came out of the No. 205 apartment building and entered the candy store. The three were seen to engage in conversation, after which Visconti left the store and reentered the apartment building.

Ottomano and Romero then emerged from the candy store and Romero walked over to Boschetti who was on the stoop at No. 209 and chased him away. Boschetti then proceeded east on 118th Street to the middle of the block, where he stopped to wait. Meanwhile Ottomano walked back and forth on the street and Romero went in and out of the store two or three times and looked up and down the street. At about 8:10 Γ.M., when Visconti reappeared on the stoop of the 205 building, Ottomano went over and Visconti handed him a brown paper bag. Ottomano then took the bag and headed east on 118th Street to where Boschetti was waiting. He then gave the bag to

Boschetti and they both walked around the block to meet Palma. In the hallway of 326 East 117th Street Ottomano took the bag from Boschetti and showed Palma that inside it were glassine envelopes containing a white powder. Boschetti then handed the bag containing the glassine envelopes to Palma who gave to Ottomano $240 in bills of which Palma had previously recorded the serial numbers. Ottomano then returned to the candy store at 205 East 118th Street where he met Romero and Visconti at about 8:20 P.M., and all three retired to the rear of the store.

Shortly before 9:00 P.M. Palma joined Coyne and Agent Moynihan at a government automobile near 114th Street and First Avenue. Palma gave the six glassine envelopes to Coyne who then and there made a field test of the white powder by dropping a sample from each of the envelopes into a "Marquis Reagent" which thereupon turned purple. The test thus disclosed that the powder was a derivative of opium.[1]

Believing that the federal narcotic laws had been violated, Agents Palma, Coyne and Moynihan together with Agent Costa, who had been assisting them, then proceeded to arrest the four men implicated in the sale of the narcotics. At about 9:40 P.M. Moynihan arrested Ottomano and Boschetti in the hallway of 326 East 117th Street. On Ottomano's person the agents found five $10 bills and on Boschetti a $5 bill, which bills were part of the $240 in currency which Palma had earlier listed before giving it to Ottomano.

At about 10:00 P.M. Costa and Coyne left the roof of 204 East 118th Street to which they had returned at about 9:20 P.M. after the field test. They crossed the street to the candy store and Costa arrested Romero just outside the candy store; Coyne entered the store and arrested Visconti. A search of Romero dis-

closed that he was carrying $125 in listed bills which Palma had used to pay Ottomano for the heroin. The agents found $30 more of this money on Visconti. Later Romero stated his age as 23 and Visconti gave his as 26. Boschetti testified that he was 17 on December 3, 1956, and a birth certificate showed that Ottomano was then 16.

At the end of the government's case Judge Levet dismissed Count 3, holding that there was insufficient evidence to show that Romero and Visconti knew that Ottomano and Boschetti were under 18 years of age on December 3, 1956.

Both appellants Romero and Visconti took the stand, denied any dealings in narcotics and claimed that they had received $155 in cash from Ottomano in payment of gambling debts incurred by Ottomano and Boschetti that afternoon in a dice game. That the jury discounted their explanation and found them guilty on Counts 1 and 4, 21 U.S.C.A. §§ 173 and 174; 26 U.S.C.A. § 7237; 18 U.S.C.A. § 371, is not surprising.[2]

■ There is no merit to the appellants' claim of error arising from the questioning of the veniremen regarding their possible scruples as to capital punishment. Count 3 of the indictment, alleging the sale of heroin by one over 18 to one under 18, charged an offense punishable by fine and imprisonment, except that the jury in its discretion could have directed the death penalty had it convicted on this count. 21 U.S.C.A. § 176b, Narcotic Control Act of July 1956. The record amply demonstrates that the grand jury was warranted in including Count 3 in the indictment and that the government was justified in trying that count. Since the government went to trial on this count, it was the duty of the court to question veniremen as to their feelings about capital punishment. The trial judge inquired whether the jurors had "any such conscientious scruples or

1. Later tests by the government chemist showed that what remained of the powders weighed 2 ounces and 419 grams, and was 5.6% to 5.8% heroin, thus confirming the preliminary field test.

2. Count 2 had been dismissed with the government's consent just before the trial began.

opinions as would prevent or preclude [them] from rendering a verdict of guilty in a case where the penalty prescribed by law may be directed by the jurors, at their option, to be death."

The statute clearly leaves to the jury the discretion as to whether capital punishment should be imposed in the event of conviction, even when the government announces at the outset, as it did here, that it will not request the death penalty. The choice of the government not to urge capital punishment can not and does not detract one iota from the jury's power to direct the death penalty. The court's questions on the examination of the prospective jurors regarding their scruples as to capital punishment were proper, and no error resulted even though Count 3 was subsequently dismissed at the end of the government's case.[3] See United States v. Puff, 2 Cir., 1954, 211 F.2d 171, certiorari denied 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106.

■ Appellant Romero further assigns as error the court's denial of his motion to suppress the $125 in recorded bills taken from him during what he alleges was an unreasonable search and seizure. Narcotic agents are given authority to make arrests without warrants when violations of the narcotic laws are committed in their presence, or when they have reasonable grounds to believe that the person arrested is committing or has committed such violation. 26 U.S.C.A. § 7607(2) I.R.C. 1954. United States v. Salli, 2 Cir., 1940, 115 F.2d 292. We think the record clearly indicates that the agents, after watching Romero's actions in and about the candy store on 118th Street and later receiving from Ottomano the envelopes which a field test showed to contain narcotics, had reasonable grounds for believing that Romero had violated the narcotic laws. Where the agents were working together and in cooperation were observing the activities of the various participants and informing each other of the progress of the conspiracy, the knowledge of each was the knowledge of all. It was their duty to arrest Romero and they clearly had the power to do so. And it follows from this that the search of Romero's person and the seizure of the recorded bills was incidental to a lawful arrest and that the fruits of the search may be used as evidence against Romero. United States v. Salli, supra.

■ Furthermore, the motion to suppress was not made until the second day of the trial, over three months after the arrest and indictment, and thus the motion was untimely. Romero argues that he was under a misapprehension as to whether there was reasonable cause for the arrest and subsequent search and seizure and that this should excuse his delay in making the motion. Both the defendant and his counsel were aware of the facts of the search and seizure on December 3. The motion therefore was addressed to the discretion of the trial court under Rule 41(e), Federal Rules of Criminal Procedure, 18 U.S.C.A., and we see no abuse of that discretion in refusing to entertain the motion which was made more than three months after the seizure and after the trial had commenced. United States v. Allied Stevedoring Corp., 2 Cir., 1957, 241 F.2d 925, certiorari denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143; United States v. Chieppa, 2 Cir., 1957, 241 F.2d 635, certiorari denied sub nom. Ivicola v. United States, 353 U.S. 973, 77 S.Ct. 1057, 1 L.Ed.2d 1136; United States v. Sansone, 2 Cir., 1956, 231 F.2d 887, certiorari denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500.

■ The third assignment of error relates to the government's calling Ottomano to the stand as a witness when the prosecution allegedly knew that he would refuse to testify. Ottomano and Boschetti had previously been convicted and

---

**3.** Indeed the defendants had had the advantage of Count 3 as a week before trial their counsel had been furnished with a list of prospective jurors, and a list of government witnesses as required by 18 U.S.C.A. § 3432 where a capital offense is charged.

sentenced for juvenile delinquency under 18 U.S.C.A. § 5031·et seq. for their part in the same transaction involved here. The government called Boschetti as a witness and he gave testimony, but when ·Ottomano was called he refused to be sworn. At the suggestion of the government, the court promptly instructed the jury that the action of this witness should be disregarded and was "not to be ·considered at all in connection with the case on either side" and this instruction was thrice repeated when Ottomano persisted in his refusal to be sworn. The instruction was stated for the fifth time when the court charged the jury.

■ It is well established that once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify. United States v. Cioffi, 2 Cir., 1957, 242 F.2d 473. Indeed, although the privilege remains for questions relating to transactions other than those for which the witness has been convicted, in no event may the witness refuse to be sworn. In our view it is immaterial whether the government was advised as to what position Ottomano would take if called as a witness. Ottomano was in the position of any witness subject to court process and he could have been compelled to testify for either side.

In view of the fact that Ottomano had intimate knowledge of the transactions upon which the prosecution was based, the government ran the risk of argument to the jury by defense counsel that the government's failure to call an available witness raised the inference that his testimony would be unfavorable to the government's case. Especially was this so where Ottomano's age and defendants' knowledge of his age as evidenced by his appearance were crucial facts under Count 3, and calling him to the stand was an essential element of the government's proof.

There was no error in the government's action in calling Ottomano to testify. The trial judge's instructions properly advised the jury that Ottomano's recalci-trance was not to be taken against either the defendants or the government.

The other assignments of error urged by the appellants are likewise without merit.

Affirmed.