William Malloy *v.* Patrick J. Hogan, Sheriff of the County of Hartford

Baldwin, C. J., King, Murphy, Shea and Alcorn, Js.

Argued December 6, 1962—decided January 3, 1963

*Harold Strauch,* for the appellant (plaintiff).

*Harry W. Hultgren, Jr.,* with whom, on the brief, were *John D. LaBelle,* state's attorney, and *George D. Stoughton,* assistant state's attorney, for the appellee (defendant).

KING, J. On September 11, 1959, the plaintiff was arrested in a gambling raid at 600 Asylum Street, Hartford, and charged, in two counts, with pool selling in violation of § 53-295 of the General Statutes. Subsequently, on November 5, he was allowed to plead nolo contendere to the first count of the information. A finding of guilty on that count was entered, and he was ordered to pay a fine of $500 and was sentenced to one year in jail, execution of the jail sentence to be suspended after ninety days of service and probation to be in effect for two years. What disposition was made of the second count of the information is not disclosed in the printed record, but the judgment file shows that a nolle prosequi was entered as to that count immediately after the imposition of the sentence under the first count.

At some time prior to January 16, 1961, the Superior Court in Hartford County, pursuant to § 54-47 of the General Statutes, entitled "Investigations into commission of crime," appointed the Honorable Ernest A. Inglis, formerly chief justice of Connecticut and then a state referee, to conduct an inquiry into whether there was reasonable cause

to believe that crimes, including gambling, had been committed in Hartford County. Witnesses were subpoenaed to appear before the referee, and on January 16, 1961, Malloy, who had been so subpoenaed, appeared and was asked certain questions by the state's attorney. Most of these Malloy refused to answer on the ground that an answer would tend to incriminate him. Thereupon, the state's attorney indicated that the matter would have to be referred to the Superior Court for contempt proceedings under the authority of § 54-47. The referee inquired of Malloy whether he had had the advice of an attorney and he replied that he had not, since he had just received the subpoena. The referee suggested that Malloy consult an attorney before he was summoned for contempt. Apparently, contempt proceedings were not then instituted, since nine days later, on January 25, 1961, Malloy was recalled as a witness and again questioned. In the meantime, he had had full opportunity to consult counsel. The questions asked him on January 25, which he refused to answer on the same claim of privilege, were practically identical with those he had been asked on his first appearance before the referee. The questions posed on both occasions are well summarized in Malloy's brief, substantially as follows: (1) For whom did Malloy work on September 11, 1959, the date he was arrested on the charge on which he was convicted? (2) Who selected and paid his counsel in connection with that charge and his defense thereto? (3) Who selected his bondsman and who paid him? (4) Who paid Malloy's fine? (5) What was the name of the tenant in the apartment in which he was apprehended? (6) Did he know John Bergoti?

On January 26, 1961, pursuant to § 54-47, Malloy

was brought before the Superior Court and, after a hearing, was found to have failed to answer proper questions before the referee and was ordered committed to jail until he answered the questions or until the further order of the court. Malloy was thereupon committed to jail. Later in the day he made application for a writ of habeas corpus, directed to the defendant as the keeper of the jail, on the ground that the confinement in jail was illegal because it was based on a denial, in violation of the fifth amendment to the constitution of the United States and of § 9 of article first of the constitution of Connecticut, of Malloy's privilege of refusing to answer questions on the ground of self-incrimination. After a hearing on February 7, 1961, the court found the issues for the defendant and that Malloy was not unlawfully confined, and it dismissed the writ of habeas corpus. From that judgment Malloy took this appeal, his basic claim of error being that his refusal to answer the questions was privileged.

The law according the privilege against self-incrimination is not open to question, but there are often difficulties in its application. The privilege is not a general one; it is, at least in all ordinary situations, to be claimed as to each question asked. *United States* v. *Romero,* 249 F.2d 371, 375 (2d Cir.); *McCarthy* v. *Clancy,* 110 Conn. 482, 490, 148 A. 551. It is not a prohibition against inquiry but confers an option of refusal to answer. *State* v. *Kemp,* 126 Conn. 60, 72, 9 A.2d 63. Our decisions from a time antedating the adoption of our constitution in 1818 have consistently recognized and upheld the privilege, and it was, by § 9 of article first, incorporated in our constitution. See, for instance, *Grannis* v. *Branden,* 5 Day 260, 272 (a malpractice case decided in 1812); *Norfolk* v. *Gaylord,* 28 Conn.

309, 312 (a civil bastardy action decided over a century ago, in 1859). This section provides that an accused in a criminal prosecution "shall not be compelled to give evidence against himself, nor be deprived of life, liberty or property, but by due course of law." This language is very similar to that of the fifth amendment to the United States constitution, and cases interpreting the scope and application of the fifth amendment in federal proceedings are not without persuasive force in the interpretation of our own constitutional provision. In *McCarthy* v. *Clancy*, supra, 488, the privilege against self-incrimination was expressly held applicable to a witness subpoenaed in a statutory investigation similar to that in which Malloy was questioned; and in *State* v. *Kemp*, supra, the privilege was held applicable to a witness summoned to appear before a grand jury. It is clear that Malloy was clothed with this privilege when he went before the referee, so that the only question is whether his refusal to answer was justified under the rules governing the exercise of the privilege.

On the one hand, the determination whether a question does or does not tend to incriminate a person cannot be left solely to his judgment, since he could then refuse to answer obviously innocuous questions. On the other hand, if he were required completely to explain the precise basis for his belief that an answer to a given question would tend to incriminate him, he might well lose much, if not all, of the benefit of the privilege, since the state might utilize his explanation to obtain "leads" to evidence for future use against him. *Hoffman* v. *United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118; *Grannis* v. *Branden*, supra.

The rule is well stated in *McCarthy* v. *Clancy*,

supra, 488: "[A] witness . . . has the right to refuse to answer any question which would tend to incriminate him. But a mere claim on his part that the evidence will tend to incriminate him is not sufficient. . . . [He having] made his claim, it is then . . . [necessary for the judge] to determine in the exercise of a legal discretion whether, from the circumstances of the case and the nature of the evidence which the witness is called upon to give, there is reasonable ground to apprehend danger of criminal liability from his being compelled to answer. That danger 'must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.' Cockburn, C. J., in *Regina* v. *Boyes,* 1 B. & S. 311, 330; see also *Brown* v. *Walker,* 161 U.S. 591, 599, 16 Sup. Ct. 644 [40 L. Ed. 819]; *Mason* v. *United States,* 244 U.S. 362, 37 Sup. Ct. 621 [61 L. Ed. 1198]; *State* v. *Thaden,* 43 Minn. 253, 255, 45 N.W.

447; *State* v. *Wood,* 99 Vt. 490, . . . [134] Atl. 697; *Manning* v. *Mercantile Securities Co.,* 242 Ill. 584, 90 N.E. 238; 4 Wigmore on Evidence (2d Ed.) § 2271 [now 8 Wigmore § 2271 (McNaughton Rev. 1961)]. Moreover, a witness called before such a tribunal as that authorized by the statute in question, against whom no accusation or proceeding is pending, could not advance such a claim as a justification for a failure to answer any question whatsoever which might be asked; for rarely would it happen that all the evidence he might give in regard to the matter under investigation would tend to incriminate him. . . . [B]efore he would be justified in refusing to answer [a given question], it must appear that there was reasonable ground to apprehend from it some real danger of incrimination. *Eckstein's Petition,* 148 Pa. St. 509, 515, 24 Atl. 63; *Ex parte Stice,* 70 Cal. 51, 53, 11 Pac. 459. The same rules apply with regard to the production of documents. *Manning* v. *Mercantile Securities Co.,* supra, 592."

It remains to apply these principles to the questions asked Malloy. Only one question, whether Malloy knew John Bergoti, was not directly connected with, and restricted to the date of, Malloy's arrest in 1959 on the pool selling charge. Bergoti is nowhere described or in any way identified, either as to his occupation, actual or reputed, or as to any criminal record he may have had. Indeed, the same may be said as to Malloy, except for the conviction for pool selling, which antedated his interrogation. Cf. *Hoffman* v. *United States,* 341 U.S. 479, 487, 71 S. Ct. 814, 95 L. Ed. 1118. Malloy made no attempt even to suggest to the court how an answer to the question whether he knew Bergoti could possibly incriminate him. That an answer might have

incriminated Bergoti would be immaterial, since Malloy's privilege, such as it was, existed solely for his own personal protection and not for the protection of any other person. *Rogers* v. *United States,* 340 U.S. 367, 371, 71 S. Ct. 438, 95 L. Ed. 344. On this state of the record the question was proper, and Malloy's claim of privilege, made without explanation, was correctly overruled. Malloy "chose to keep the door tightly closed and to deny the court the smallest glimpse of the danger he apprehended. He cannot then complain that we see none." *In re Pillo,* 11 N.J. 8, 22, 93 A.2d 176; see also, *Hoffman* v. *United States,* supra, 489 (wherein it was held erroneous to refuse to consider explanations of a witness as to why he felt his answers to questions asked of him might incriminate him).

We turn now to the other questions asked Malloy, all of which were restricted in time and subject matter to the particular crime for which he was convicted in 1959. We need not decide whether, on their face and apart from any consideration of Malloy's immunity from prosecution, the questions should or should not have been answered in the light of his failure to give any hint of explanation as to how answers to them could incriminate him. In any event, as hereinafter pointed out, he was apparently clothed with immunity from any prosecution growing out of answers to the questions, and he failed in any way to point out any infirmity in that immunity.

The state's attorney pointed out to Malloy that the questions were "about a matter on which you are already convicted and there can be no incrimination in that." Cf. *United States* v. *Smith,* 4 Day 121, 126. The referee evidently felt that no self-incrimination was involved. This is indicated by

his suggestion to Malloy that he consult a lawyer before contempt proceedings were instituted. Of course, Malloy could not again be convicted of the identical crime of pool selling, and if this was the only possible danger of self-incrimination the privilege of refusal to answer would not exist. *United States* v. *Romero,* 249 F.2d 371, 375 (2d Cir.). However, the statute, § 53-295, under which the 1959 conviction was had, penalized a number of closely related acts, all basically concerned with pool selling, and as to many of these acts it provided that "each day of . . . [doing the act] shall constitute a separate offense." Even though Malloy could not again be tried on the identical charge on which he was convicted, he was entitled to assert his claim of privilege if there was a danger that his answers to the questions might furnish a "lead" to information which could be used to procure his conviction on a charge based on some other offense committed on the same day or on a charge based on the same or another offense committed on some other day, even the following day. See cases such as *Hoffman* v. *United States,* supra, 486; *Blau* v. *United States,* 340 U.S. 159, 161, 71 S. Ct. 223, 95 L. Ed. 170. Indeed, the second count of the 1959 information had charged the same type of pool selling on the day before the date charged in the first count, on which the conviction was had.

Where the state opposes a claim of privilege from self-incrimination on the ground of immunity from possible punishment—whether the immunity arises from a prior conviction, from the bar of a statute of limitations, from a pardon, or from any other cause—the state has the burden of proving the adequacy of the protection afforded by the immunity claimed. *United States* v. *Goodman,* 289 F.2d

256, 262 (4th Cir.), cert. granted, 368 U.S. 14, 82 S. Ct. 127, 7 L. Ed. 2d 75; 58 Am. Jur., Witnesses, § 84. A collection of cases illustrating the application of this general rule may be found in an annotation in 101 A.L.R. 389. Under the circumstances here, we prefer not to rest our decision on the ground that the state sufficiently sustained its burden of proving the adequacy of the immunity afforded by the 1959 conviction, considered alone.

There remains for consideration immunity arising from the bar of the Statute of Limitations. The maximum permissible penalty for any type of violation of the pool selling statute under which he was convicted (§ 53-295) was a fine of $500 and imprisonment of not over one year. Malloy's crime in 1959 was, therefore, a misdemeanor and not a felony. General Statutes § 1-1. The applicable limitation was "one year next after the offense has been committed." § 54-193. That period had expired before Malloy's interrogation in 1961. The referee's hearing was, in fact, more than a year after the conviction of Malloy and the disposition of the criminal case on November 5, 1959. It is true that the operation of the Statute of Limitations is suspended during periods in which the person charged "fled from and resided out of this state." But Malloy made no claim that he was without the state for any period. In his habeas corpus application, and also at the hearing before the referee, he gave his residence as Windsor, Connecticut. His 1959 arrest was in Hartford. Under these circumstances, there would be no inference that he was at any time without the confines of the state so as to toll the Statute of Limitations. If at the hearing before the referee Malloy relied on absence from the state to toll the statute, he would have had to

advance that claim in order to have it considered by the court on the question of the adequacy of the immunity from punishment provided by the Statute of Limitations. Nothing of this kind was attempted. Under the facts here, we do not feel that the burden was on the state, at least in the first instance, of negating the naked possibility that the Statute of Limitations was tolled under the exception quoted above. See *State* v. *Lee,* 69 Conn. 186, 199, 37 A. 75. If, and to the extent that, cases such as *People* v. *Rockola,* 339 Ill. 474, 477, 171 N.E. 559, would require a holding to the contrary in this particular case, we cannot follow them.

Malloy did suggest that on a felony charge—what felony charge he did not specify—the applicable limitation would be five years. See General Statutes § 54-193; *In re Pillo,* 11 N.J. 8, 21, 93 A.2d 176. As far as appears, the only criminal activity in which Malloy had ever engaged was the misdemeanor of pool selling, and this only in September, 1959. There is nothing to indicate any danger to Malloy of a prosecution for any felony. Malloy also mentioned, before us, a possible prosecution for conspiracy to commit some unspecified crime, and something was made of the fact that the Statute of Limitations on a continuing conspiracy does not start to run until the last overt act is committed. *State* v. *Kemp,* 126 Conn. 60, 85, 9 A.2d 63. There is nothing to suggest a continuing conspiracy. Nor is there anything to indicate any possible danger to Malloy of a prosecution for any conspiracy other than perhaps a conspiracy to violate the pool selling statute. For such a conspiracy, the limitation is but one year, since it is the same for a conspiracy to commit a misdemeanor as for the misdemeanor itself. General Statutes § 54-197. In all this, Malloy

confounds vague and improbable possibilities of prosecution with reasonably appreciable ones. Under claims like his, it would always be possible to work out some finespun and improbable theory from which an outside chance of prosecution could be envisioned. Such claims are not enough to support a claim of privilege, at least where, as here, a witness suggests no rational explanation of his fears of incrimination, and the questions themselves, under all the circumstances, suggest none.

Although the claim was not made by Malloy, it is true that the state did not prove, as clearly as would have been desirable, that there was no prosecution of any sort actually instituted and outstanding against Malloy to which the Statute of Limitations would not be an effective bar. *United States* v. *Goodman,* 289 F.2d 256, 263 (4th Cir.), cert. granted, 368 U.S. 14, 82 S. Ct. 127, 7 L. Ed. 2d 75. That there was no such prosecution was, however, implicit in the statement of the state's attorney to Malloy that he could not be incriminated by answering the questions, and Malloy makes no claim that there was any such prosecution. Under all the circumstances, and in the absence of any hint of explanation from Malloy, we do not think that it is necessary, in this particular case, to reverse the court below because the state went no further in its evidence on this point.

The fifth amendment does not apply, as such, to state courts. *Cohen* v. *Hurley,* 366 U.S. 117, 118 n.1, 81 S. Ct. 954, 6 L. Ed. 2d 156. However, the fourteenth amendment, in its guarantee of due process, probably does prohibit a state court from so ruling on a claim of privilege from self-incrimination as to violate the fundamental concepts of justice and a fair trial. Ibid.; *Adamson* v. *California,* 332 U.S.

46, 51, 67 S. Ct. 1672, 91 L. Ed. 1903. But as already pointed out, Malloy did not, in respect to any of the questions he refused to answer, bring himself within the settled rules defining the right to assert a privilege against self-incrimination. Thus there could be no violation of due process, and there was no error in Malloy's commitment for contempt.

There is no error.

In this opinion the other judges concurred.