## THE STATE OF CONNECTICUT *vs.* JOHN GAETANO.

Third Judicial District, Bridgeport, April Term, 1921.
WHEELER, C. J., BEACH, GAGER, CURTIS and BURPEE, JS.

While the Sixth Amendment to the Federal Constitution, providing that an accused in a criminal prosecution shall be confronted with the witnesses against him, applies only to proceedings in Federal ·courts, a provision to the same effect appears in § 9, Article First, of our State Constitution; and in either case the primary object of the provision was to protect the accused from depositions and *ex parte* affidavits and to give him the benefit not only of testing the recollections of the witnesses, but also of compelling the witnesses to stand face to face with the jury.

This provision cannot be considered as having barred all the exceptions, recognized at the time of the adoption of the Constitution, to the common-law principle, which it was designed to set forth, that criminal evidence consists ordinarily in facts within the personal knowledge of the witness, to be testified to in open court in the presence of the accused; and hence the testimony given at the preliminary examination, by a witness who cannot be produced at the trial, is admissible against an accused, if he had the opportunity to confront and cross-examine the witness, and if he was present as the party charged with the offense under investigation, and the offense there charged and the one being tried are substantially the same.

In a prosecution for keeping a house of ill fame, the State offered in evidence, upon the oath of the stenographer, the stenographic notes of the testimony of a witness at the trial of the accused upon the same charge before the City Court acting as a committing magistrate, at which trial the accused, who was also being tried for other offenses, was present, and by his counsel cross-examined the witness. About three weeks before the trial on appeal, the witness, who had been detained as a material witness, escaped from detention and had not since been located, although searches for her had been conducted in various places within and without the State. *Held* that the evidence, limited to that portion relevant to the offense now charged, was admissible.

Whether "knowingly" is or is not to be implied in the definition of a statutory crime where it is not expressed, must be determined from the general scope of the Act and from the nature of the evils to be avoided; and in many statutes in the nature of police regulations for the protection of the morals of the community, either

The State *v.* Gaetano.

because it is impracticable to prove knowledge, or because it is regarded as reasonable under the circumstances that the doer of the act should take the risk of knowing the facts, the prohibited act is criminal notwithstanding the ignorance of the accused.

In the offense of keeping a house of ill fame, defined by General Statutes, § 6384, "knowingly" is not to be implied as an essential part of the crime, since the Act is such a police regulation, and it is reasonable to require that whoever in fact keeps such a house should take the risk of knowing the facts.

Under an information for this crime, evidence of the reputation of the place as a house of ill fame, and that it was resorted to by lewd persons for the purposes of prostitution, is admissible; and hence the next door neighbor of the accused may testify that she was called to the door late at night by men and boys asking for girls, and inquiring if her place was the place of the accused.

Argued April 15th—decided June 1st, 1921.

INFORMATION for keeping a house of ill fame, brought to the Criminal Court of Common Pleas in New Haven County and tried to the jury before *Simpson, J.;* verdict and judgment of guilty, and appeal by the accused. *No error.*

*Thomas R. Fitzsimmons,* for the appellant (the accused).

*Edwin S. Pickett,* Prosecuting Attorney, for the appellee (the State).

CURTIS, J.   Upon the trial of the accused it was proved that he was arrested on September 30th, 1920, and on October 9th, 1920, tried in and by the City Court for the city and town of New Haven on three distinct charges, viz: harboring a female for purposes of prostitution, accepting earnings of a female by prostitution, and keeping a house of ill fame. At the conclusion of the trial in the City Court, the accused was bound over to the Superior Court on the first two charges; and the charge of keeping a house of ill fame was nolled by the City Attorney. The accused was

subsequently arrested on a bench warrant issuing from the Court of Common Pleas for New Haven County, and the information filed against him in that court was in all respects the same and for the same offense as the one which was nolled in the City Court. During the trial in the City Court, the State called as a witness Ruth Blair, who was arrested in defendant's house at the same time defendant was first arrested, and she testified in behalf of the State, and was fully cross-examined by the attorney for the accused.

Following the trial in the City Court, Ruth Blair was detained by the authorities in the Children's Building, in the city of New Haven, as a material witness, and on November 9th, 1920, escaped from said building. Upon discovery that she had escaped, the superintendent of said Children's Building immediately notified the police of the city of New Haven, who in turn notified the prosecuting attorney of the Court of Common Pleas, and efforts were undertaken and made for her location and apprehension. These efforts included searches in and about New Haven and visits to Meriden, Waterbury and Bridgeport, and Springfield and Pittsfield, in the State of Massachusetts, at which places they had reason to believe she might be known and found. In Waterbury the parents of Ruth Blair were seen and interrogated as to her probable whereabouts, and the assistance of the local police was engaged in different cities in endeavoring to locate the witness; and although the search and inquiries continued to be made up to the time of the trial, she was unable to be found and produced in the trial court.

The State thereupon offered her testimony as given in the City Court, and the court, over the objection of defendant's counsel, being satisfied that all reasonable efforts had been made to locate her and that she could not be found or produced in court, and it further

appearing that her testimony when given in the City Court had been taken down by a competent stenographer, admitted her testimony, in so far as it was relevant to the issues before the court, and the stenographer, being duly sworn as a witness, read from his original stenographic notes her testimony.

The accused objected to the testimony because it was immaterial, irrelevant and incompetent, and in contravention of the Constitution of the United States and the State of Connecticut, in that he was not confronted by the witness, and also because the issues were not the same, in that the City Court had no jurisdiction to determine the guilt or innocence of the accused, but acted only as a committing magistrate. He also objected to the testimony being received and admitted in evidence because it appeared that the defendant in the City Court was being tried on two other distinct charges. The court ruled that only that portion of the testimony relevant to the issues in this case should be received, and, upon objection, excluded certain testimony which was not relevant to the issues before the court.

Defendant's counsel also objected to the testimony being received because for aught that appeared Ruth Blair might still be within the jurisdiction of this court and might be in the city of New Haven or Hartford, and the State had not shown, in view of the shortness of the time from November 9th, 1920, the date of the escape, to the date of the motion, December 3d, 1920, that it had made any reasonable efforts to locate her, and expressed his willingness to have the case continued for the purpose of allowing the State further time to locate the witness.

The court, however, was satisfied from the evidence that all reasonable efforts had been made to locate the witness, and that there was no reason to believe that

she could be found or located within the jurisdiction of the court at any reasonable time in the future.

We will first consider the objections to this evidence based upon constitutional grounds. The objection that its admission was in contravention of the Sixth Amendment of the Constitution of the United States is not tenable. This Amendment, which provides that an accused in a criminal prosecution shall be confronted with the witnesses against him, does not apply to proceedings in a State court, but only to proceedings in Federal courts. *West* v. *Louisiana*, 194 U. S. 258, 262, 24 Sup. Ct. 650. "The first ten amendments to the Federal Constitution contain no restrictions on the powers of the State but were intended to operate solely on Federal Government." *Brown* v. *New Jersey*, 175 U. S. 172, 174, 20 Sup. Ct. 78; *Barron* v. *Baltimore*, 32 U. S. (7 Pet.) 243.

It is also claimed that the admission of this evidence was in contravention of § 9 of Article First of the State Constitution. This section provides that in all criminal prosecutions the accused shall have a right to be confronted by the witnesses against him. The underlying reasons for the adoption of this right in the Federal Constitution and in State constitutions, and the principles of interpretation applying to this provision, are identical. In *Mattox* v. *United States*, 156 U. S. 237, 242, 15 Sup. Ct. 339, a case dealing with the admissibility of the former testimony of a person since deceased, the court states the purpose and scope of this provision: "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the

conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether it is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.

"We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizens, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a Bill of Rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the

just protection of the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. As was said by the Chief Justice when this case was here upon the first writ of error (146 U. S. 140, 152, 13 Sup. Ct. 50), the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath. If such declarations are admitted, because made by a person then dead, under circumstances which give his statements the same weight as if made under oath, there is equal if not greater reason for admitting testimony of his statements which were made under oath.

"The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of, and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon

this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes and of the testimony of the deceased witness, such as was produced in this case, is competent evidence of what he said."

The constitutional provision under consideration was therefore designed to incorporate, in a way not subject to legislative change, the common-law principles in reference to criminal evidence to the effect that primarily such evidence "consists in facts within the personal knowledge of the witness, to be testified to in open court in the presence of the accused." This primary rule was at common law limited and controlled by subordinate rules, which render it safe and useful in the administration of justice, and the constitutional provision in question was intended to secure the primary principle, and also the established limitations, by incorporating them into the Constitution. *Stage* v. *McO'Blenis*, 24 Mo. 402, 69 Amer. Dec. 435.

In a note on *State* v. *Heffernan*, 24 So. D. 1, 123 N. W. 87, found in 25 L. R. A. (N. S.) 868, the annotator states, in effect, that the overwhelming majority of courts hold that the testimony given at the preliminary examination, by a witness who cannot be produced at the trial, is admissible against an accused if he had the opportunity to confront the witness, and subject him to cross-examination in the proceeding in which the testimony was taken, provided he was present as the party charged with the offense which was being investigated, and the offense there charged and the one being tried are substantially the same.

Several State courts, which have interpreted this constitutional provision as if all the common-law exceptions to its strict application were barred by its terms, have been constrained to overrule their first

impressions and adopt an interpretation in accord with the principles stated above. See *State* v. *Heffernan*, 22 So. D. 513, 118 N. W. 1027, overruled by *State* v. *Heffernan*, 24 So. D. 1, 123 N. W. 87; and *Cline* v. *State*, 36 Tex. Cr. Rep. 320, 36 S. W. 1099, overruled by *Porch* v. *State*, 51 Tex. Cr. Rep. 7, 99 S. W. 1122.

The accused in the City Court trial was charged with the identical offense for which he was prosecuted in the trial court. He was present, and by his counsel cross-examined Ruth Blair. The trial court properly found that diligent and reasonable search had been made for the witness to secure her attendance on the trial, and that there was no reason to believe that she could be found and procured as a witness at any reasonable time in the future, and that the State was not at fault in her escape from detention as a witness. The accused in the City Court trial was also charged with two other offenses. The trial court limited the portion of the testimony of Ruth Blair given in the City Court to be read at the trial below to that portion relevant to the issues then on trial. Under the above circumstances the trial court properly held that the stenographic notes of the testimony of Ruth Blair in the City Court, in so far as relevant to the offense charged in the trial court, were admissible, upon the oath of the stenographer in the City Court that the notes read were a correct transcript of his notes and of the testimony of Ruth Blair as given in the City Court. See 1 Greenleaf on Evidence (16th Ed.) § 163f; Underhill on Criminal Evidence (2d Ed.) Chap. 21 (pp. 469–486); 2 Wigmore on Evidence, § 1395 *et seq.;* 1 Wharton on Criminal Evidence (10th Ed.) § 228 *et seq.;* 1 Chamberlayne on Evidence, § 458 *et seq.*

The accused does not press his objection that the evidence was not admissible because taken in the City Court acting as a committing magistrate, or because

two other offenses were also charged against the accused in the City Court. There was no error in the admission of this evidence as claimed in the second and third assignments of error.

In the eleventh, twelfth, thirteenth, fourteenth and fifteenth assignments of error the accused claims, in effect, that the court erred in not charging the jury that the accused could not be found guilty unless the State proved beyond a reasonable doubt that he knew that the house he maintained was in fact a house of ill fame.

Among the facts which the accused claimed to have proved was the following: "The house, number 62 College Street, kept by the defendant, had been occupied by him under a lease from the owners for a period of some six years, and was kept and maintained by him as a dining and rooming house." The accused therefore admitted that he kept the house.

The statute involved (General Statutes, § 6384), provides that "every person who shall keep a house which is, or is reputed to be, a house of ill fame, or which is resorted to, or is reputed to be resorted to, for the purposes of prostitution or lewdness, . . . shall be fined. . . ."

In *Caldwell* v. *State,* 17 Conn. 467, 472, we say, in effect, that the essential elements of the crime charged in an information of this kind are as follows: first, that the accused kept the house in question; second, that the reputation of the house was that of a house of ill fame; third, that the house was in fact a house of ill fame.

The statutory definition of the crime does not contain the word "knowingly" or its equivalent. This omission, however, is not conclusive upon the question whether or not the State must prove that the accused knew that the house he kept was a house of ill fame.

Stephen's History of Criminal Law (Vol. 2, p. 117) states the law in substance as follows: Whether "knowingly" is or is not to be implied in the definition of a statutory crime, where it is not expressed, must be determined from the general scope of the Act, and from the nature of the evils to be avoided. See *State* v. *Nussenholtz*, 76 Conn. 92, 96, 55 Atl. 589.

Clark on Criminal Law (3d Ed.) pp. 92, 93, says: "There are many statutes in the nature of police regulations for the protection of the morals of the community, . . . under which, either because it is impracticable to . . . prove knowledge, or because it is regarded as reasonable under the circumstances that the doer of the act should take the risk of knowing the facts, it is generally held that the prohibited act is criminal, notwithstanding" the ignorance of the accused. In *Barnes* v. *State*, 19 Conn. 398, we held that, in a prosecution for selling spirituous liquors to a common drunkard, that it was not necessary to prove that the defendant knew that the person to whom the liquor was sold was a common drunkard. In *State* v. *Kinkead*, 57 Conn. 173, 17 Atl. 855, we held that a statute forbidding a licensed dealer in liquors to allow any minors to loiter on the premises where such liquor is sold, was violated if a minor was allowed to loiter on the premises, although the licensed seller believed he was of age. In *Commonwealth* v. *Boynton*, 84 Mass. (2 Allen) 160, the court held that a person may be convicted of being a common seller of intoxicating liquor, although he did not know or suppose the liquor sold by him to be intoxicating.

We are satisfied that "knowingly" is not to be implied as an essential part of the crime defined in General Statutes, § 6384, because this Act is a police regulation for the protection of the morals of the community, and it is reasonable to require that who-

The State *v.* Gaetano.

ever in fact keeps a house which is a house of ill fame should take the risk of knowing the facts.

The court did not err in failing to charge the jury that it was an essential element of the crime charged, which must be proved by the State beyond a reasonable doubt, that the accused knew that the house he kept was, in fact, a house of ill fame.

In the sixth, seventh, eighth, ninth and tenth assignments of error the accused claims, in effect, that the charge of the court was inadequate in defining the burden of proof resting upon the State in this criminal case. The charge of the court contained the substance of most of the requests of the accused. It was adequate to the situation presented. There was no specific fact essential to the guilt of the accused which the accused claimed ought, or which was reasonably required to be specifically pointed out to the jury as requiring proof beyond a reasonable doubt, as in *State* v. *Brauneis*, 84 Conn. 222, 79 Atl. 70.

The accused also claimed error in certain rulings upon evidence in his first, fourth and fifth assignments of error. The State called as a witness a Mrs. Margaret E. Foster, who testified on direct examination that she lived at number 60 College Street, being one half of the building, the other half of which was conducted by the defendant, and that she had lived there approximately two years, and that the place conducted by the defendant had the reputation of being a house of ill fame. On cross-examination she testified that she was the housekeeper at number 60 College Street, which was also a rooming house; she was then interrogated with reference to whom she had talked with reference to the place kept by defendant being a house of ill fame, and as to what she knew with regard to what took place inside of defendant's house; and, upon redirect examination, was further inquired of by the State

whether she had observed anything in reference to 62 College Street (Gaetano's place). She replied that she had been called in the night to answer the door bell between eleven and two o'clock by men asking for girls, and asking if her home was 62 College Street, and if Johnny Gaetano lived there. Counsel for the accused objected to this evidence, on the ground that it was hearsay, and, upon its admission, duly excepted.

Under the information, evidence of the reputation of the tenement 62 College Street, as to whether or not it was a house of ill fame, was admissible. Also evidence was admissible to show that the Gaetano place was resorted to by lewd persons for the purposes of prostitution, as tending to prove its real character. *Caldwell* v. *State,* 17 Conn. 467. The fact that late at night the next door neighbor of the accused was called to the door by men and boys asking for girls, and asking if her place was the place of the accused, Johnny Gaetano, was admissible as tending to show that Gaetano's place was visited by lewd persons for the purpose of prostitution or lewdness. There was no error in the admission of this evidence.

The remaining assignments of error are so obviously untenable as not to require discussion.

There is no error.

In this opinion the other judges concurred.