STATE OF CONNECTICUT *v.* AMELIA F. SWAIN
(SC 15744)

Callahan, C. J., and Borden, Norcott, Katz and McDonald, Js.

Argued March 18—officially released July 21, 1998

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *John T. Redway*, state's attorney, and *John Cashmon*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The dispositive issue in this appeal is whether knowledge that one's license has been suspended is an essential element of the crime of operating a motor vehicle with a suspended license in violation of General Statutes § 14-215.[1] We conclude that it is not.

---

[1] General Statutes § 14-215 provides: "Operation while registration or license is refused, suspended or revoked. (a) No person to whom an operator's license has been refused, or whose operator's license or right to operate a motor vehicle in this state has been suspended or revoked, shall operate any motor vehicle during the period of such refusal, suspension or revocation. No

The following facts are relevant to this appeal. On June 7, 1995, the defendant, Amelia F. Swain, was driving on Route 1 in Old Saybrook when she was stopped by patrol officer Charles Bellarocco because one of the headlights on her vehicle was out. After the defendant was unable to produce her operator's license, Bellarocco learned, based on her name and birth date, that her license had been suspended.[2] Bellarocco gave the defendant a warning for the inoperable headlight and a summons for driving with a suspended license, and he informed the defendant that she could not drive her vehicle. The defendant was subsequently charged with operating a motor vehicle while her license was under suspension in violation of § 14-215 (a).[3]

During the jury portion of the defendant's bifurcated trial,[4] testimony revealed that prior to May 11,

person shall operate or cause to be operated any motor vehicle, the registration of which has been refused, suspended or revoked, or any motor vehicle, the right to operate which has been suspended or revoked.

"(b) Except as provided in subsection (c) of this section, any person who violates any provision of subsection (a) of this section shall be fined not less than one hundred fifty dollars nor more than two hundred dollars or imprisoned not more than ninety days or be both fined and imprisoned for the first offense, and for any subsequent offense shall be fined not less than two hundred dollars nor more than six hundred dollars or imprisoned not more than one year or be both fined and imprisoned.

"(c) Any person who operates any motor vehicle during the period his operator's license or right to operate a motor vehicle in this state is under suspension or revocation on account of a violation of subsection (a) of section 14-227a or section 53a-56b or 53a-60d or pursuant to section 14-227b, shall be fined not less than five hundred dollars nor more than one thousand dollars and imprisoned not more than one year, thirty consecutive days of which may not be suspended or reduced in any manner."

[2] Bellarocco testified at trial that the defendant did not produce her operator's license when she had been stopped. In contrast, the defendant testified that she did in fact possess her license at that time and that she produced it for Bellarocco. In light of the fact that the defendant's license had been suspended, the jury reasonably could have found that she was unable to produce her license.

[3] See footnote 1 of this opinion.

[4] The defendant was charged in a two part information. The first part of the information, namely, the charge of driving with a suspended license in

1995,[5] the defendant had been stopped while operating a motor vehicle and had failed a subsequent chemical alcohol test that had been administered pursuant to General Statutes § 14-227b.[6] On or about May 11, 1995, the department of motor vehicles (department) mailed

violation of § 14-215 (a), was tried to a jury. With respect to the second part of the information, namely, whether the defendant's license previously had been suspended in accordance with § 14-227b, the defendant waived her right to a jury and submitted to a court trial.

[5] It is not clear from the record or trial testimony when the defendant had failed the chemical alcohol test.

[6] General Statutes § 14-227b provides in pertinent part: "Implied consent to test. Suspension of license for refusing to submit to test or having elevated blood alcohol content. Hearing. (a) Any person who operates a motor vehicle in this state shall be deemed to have given his consent to a chemical analysis of his blood, breath or urine and, if said person is a minor, his parent or parents or guardian shall also be deemed to have given his consent.

"(b) If any such person, having been placed under arrest for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both or while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, and thereafter, after being apprised of his constitutional rights, having been requested to submit to a blood, breath or urine test at the option of the police officer, having been afforded a reasonable opportunity to telephone an attorney prior to the performance of such test and having been informed that his license or nonresident operating privilege may be suspended in accordance with the provisions of this section if he refuses to submit to such test or if he submits to such test and the results of such test indicate that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight, and that evidence of any such refusal shall be admissible in accordance with subsection (f) of section 14-227a and may be used against him in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that he informed the person that his license or nonresident operating privilege may be suspended if he refused to submit to such test or if he submitted to such test and the results of such test indicated that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight.

"(c) If the person arrested refuses to submit to such test or analysis or submits to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicate that the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight, the police officer, acting on behalf of the

a license suspension notice to the defendant. The notice informed the defendant, inter alia, that: (1) she had failed a chemical alcohol test; (2) she was entitled to a hearing, which she must request within seven days;[7] (3) her Connecticut driver's license would be suspended as of June 5, 1995; (4) the suspension would last for ninety days; and (5) if she operated a motor vehicle during the term of her suspension, she would

Commissioner of Motor Vehicles, shall immediately revoke and take possession of the motor vehicle operator's license or, if such person is a nonresident, suspend the nonresident operating privilege of such person, for a twenty-four-hour period and shall issue a temporary operator's license or nonresident operating privilege to such person valid for the period commencing twenty-four hours after issuance and ending thirty days after the date such person received notice of his arrest by the police officer. The police officer shall prepare a written report of the incident and shall mail the report together with a copy of the completed temporary license form, any operator's license taken into possession and a copy of the results of any chemical test or analysis to the Department of Motor Vehicles within three business days. . . .

"(d) Upon receipt of such report, the Commissioner of Motor Vehicles may suspend any license or nonresident operating privilege of such person effective as of a date certain, which date shall be not later than thirty days after the date such person received notice of his arrest by the police officer. Any person whose license or operating privilege has been suspended in accordance with this subsection shall automatically be entitled to a hearing before the commissioner to be held prior to the effective date of the suspension. The commissioner shall send a suspension notice to such person informing such person that his operator's license or nonresident operating privilege is suspended as of a date certain and that he is entitled to a hearing prior to the effective date of the suspension and may schedule such hearing by contacting the Department of Motor Vehicles not later than seven days after the date of mailing of such suspension notice.

"(e) If such person does not contact the department to schedule a hearing, the commissioner shall affirm the suspension contained in the suspension notice for the appropriate period specified in subsection (h) of this section.

"(f) If such person contacts the department to schedule a hearing, the department shall assign a date, time and place for the hearing, which date shall be prior to the effective date of the suspension. . . .

"(h) The commissioner shall suspend the operator's license or nonresident operating privilege, and revoke the temporary operator's license or nonresident operating privilege issued pursuant to subsection (c) of this section, of a person who did not contact the department to schedule a hearing . . . ."

[7] There is no evidence in the record that the defendant ever had requested a hearing.

be "subject to a minimum mandatory jail sentence of thirty days."

The notice was mailed by "bulk certified mail to the address of the [defendant] . . . as shown by the records of the commissioner" of motor vehicles in accordance with General Statutes § 14-111 (a), which provides the method for notifying an operator of a license suspension.[8] A representative from the department testified at trial that bulk certified mailing "acknowledges that the [department] sent an item to the United States Postal Service." A "bulk certified mailing list is sent with a bulk of mail to the post office which in turn acknowledges, signs the receipt and turns it over to our department to acknowledge that they have received that mail." It does not acknowledge, however, that a particular individual on that list received

---

[8] General Statutes § 14-111 (a) provides: "No provision of this chapter shall be construed to prohibit the commissioner from suspending or revoking any registration or any operator's license issued under the provisions of any statute relating to motor vehicles, or from suspending the right of any person to operate a motor vehicle in this state, or from suspending or revoking the right of any nonresident to operate, or the right to any operation of, any motor vehicle within this state, for any cause that he deems sufficient, with or without a hearing. Whenever any certificate of registration or any operator's license or both are suspended or revoked, all evidence of the same shall be delivered forthwith to the commissioner or to any person authorized by him to receive the same, and the commissioner or any person authorized by him may seize such certificate of registration or operator's license and all evidence of the same. Except as otherwise provided by law, the commissioner may cancel any such suspension or revocation and may return such certificate of registration or the operator's license either with or without an additional fee, provided no certificate of registration or operator's license which has been suspended for any definite term, except as provided in subsection (k) of this section, shall be returned until the term of suspension has been completed. Any appeal taken from the action of the commissioner shall not act as a stay of suspension or revocation except with his consent. *No service of process shall be necessary in connection with any of the prescribed activities of the commissioner, but a notice forwarded by bulk certified mail to the address of the person registered as owner or operator of any motor vehicle as shown by the records of the commissioner shall be sufficient notice to such person that the certificate of registration or operator's license is revoked or under suspension.*" (Emphasis added.)

his or her mail. The department does not know whether each notice sent by bulk certified mail actually was received, but if a notice was returned to the department, it would be placed in the department's files. The notice sent to the defendant was not found in the department's files.

The defendant testified at trial that she had not received the notice and was not aware that her license had been suspended. She also testified that her mail delivery was unreliable because her mailbox was one of fifteen mailboxes grouped together and that "you sometimes don't get certain things that should be coming in and many, many times, at least a couple of times a week, I'm getting things that belong to somebody else."

Following the close of testimony, the defendant requested that the trial court instruct the jury that knowledge of the suspension of her license is an essential element of § 14-215 (a).[9] The trial court, *Miano, J.*, relying on *State* v. *Torma*, 21 Conn. App. 496, 574 A.2d 828 (1990), denied the defendant's request and, instead, instructed the jury that knowledge of the suspension is not required. Specifically, the trial court instructed the jury that the elements of § 14-215 (a) are: "One, that the defendant was operating a motor vehicle at the time and place alleged, two, that she was operating this

---

[9] The defendant submitted to the trial court the following written request to charge the jury:

"For the defendant to be convicted of operating a motor vehicle while her motor vehicle license is under suspension, it would be necessary for the jury to find beyond a reasonable doubt that the defendant knew that her motor vehicle license was under suspension.

"Legal Authority: *Bell* v. *Burson*, 402 U.S. 535, [91 S. Ct. 1586, 29 L. Ed. 2d 90] (1971); *Commonwealth* v. *Horney*, [365 Pa. Super. 152] 529 A.2d 18 (1987); *State* v. *Counts*, 783 S.W.2d 181, 182 (Mo. 1990); *State* v. *Aldrich*, 83 Or. App. 643, 732 P.2d 943 (1987) [rev'd on other grounds, 305 Or. 466, 752 P.2d 311 (1988)].

"To the contrary: *State* v. [*Torma*], 21 Conn. App. 496 [574 A.2d 828] (1990)."

motor vehicle on a public highway of this state and, three, that the defendant was operating the motor vehicle at this location while her license was under suspension. . . .

"The third element is that the operation occurred while her license was under suspension by the commissioner of motor vehicles. The third element of operating while under suspension requires proof of compliance with [§ 14-111 (a)].

"[Section 14-111 (a)] does not require personal service of a notice of suspension but provides that if . . . a notice is forwarded by bulk certified mail to the address of the person registered as owner or operator of any motor vehicle as shown by the records of the commissioner shall be sufficient notice to such person . . . .

"The statute does not require that a defendant actually receive notice or that the [department] receive a return receipt. Constructive notice by the [department] is all that is required.

"Constructive notice is information or knowledge of a fact imputed by law to a person although she may not . . . actually have it because she could have discovered the fact by proper diligence. That's what the definition of constructive notice is."

The defendant took exception to the trial court's instructions, arguing that § 14-215 (a) requires that she possess actual knowledge that her license was under suspension. The jury found the defendant guilty of operating a motor vehicle with a suspended license in violation of § 14-215 (a).

Thereafter, a court trial was held to determine whether the underlying reason for the defendant's license suspension was her failure of a chemical alcohol

test administered pursuant to § 14-227b.[10] A defendant convicted for driving with a suspended license is subject to enhanced penalties if the underlying reason for the license suspension is a violation of § 14-227b. These penalties are "[a fine of] not less than five hundred dollars nor more than one thousand dollars and [imprisonment of] not more than one year, thirty consecutive days of which may not be suspended or reduced in any manner."[11] General Statutes § 14-215 (c). Following the court's denial of the defendant's motions for acquittal and for a new trial, the court found that on June 7, 1995, the defendant's license was under suspension for having failed a chemical alcohol test pursuant to § 14-227b. On September 19, 1995, pursuant to § 14-215 (c), the trial court sentenced the defendant to one year imprisonment, execution suspended after forty-five days, a $500 mandatory minimum fine, court costs and one year probation. This appeal followed.[12]

The dispositive issue is whether § 14-215 (a) requires proof beyond a reasonable doubt of actual knowledge

[10] During the court trial, much of the same evidence regarding the notice of suspension was presented as during the jury trial. A representative from the department testified that the defendant's license had been suspended because she had failed a chemical alcohol test, that a suspension notice had been mailed to the defendant by bulk certified mail, and that the notice informed the defendant of her right to a hearing and the effective date and length of the suspension. Additionally, the state introduced the defendant's driving history record, which showed that her license had been suspended for failing a chemical alcohol test pursuant to § 14-227b.

[11] Section 14-215 (b) describes the penalties for driving with a suspended license when the underlying cause of the suspension is a reason other than operating while under the influence of intoxicating liquor or any drug; General Statutes § 14-227a (a); manslaughter in the second degree with a motor vehicle; General Statutes § 53a-56b; assault in the second degree with a motor vehicle; General Statutes § 53a-60d; or refusing to submit to a chemical alcohol analysis or having elevated blood alcohol content. General Statutes § 14-227b.

[12] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

of the suspension, or if proof of delivery by bulk certified mail is sufficient.[13] The defendant argues that the trial court improperly failed to instruct the jury that a violation of § 14-215 (a) requires actual knowledge of a license suspension. The state on the other hand maintains that neither the statutory scheme nor the legislative history evinces an intent by the legislature to include actual knowledge of suspension as an element of the crime of operating under suspension. We agree with the state and affirm the judgment of the trial court.

It is undisputed that the defendant properly preserved her claim for appellate review.[14] Because the defendant's claim that the trial court failed to instruct on an essential element of the crime charged raises a question of law requiring our construction of § 14-215, our review is plenary. *State* v. *Dash*, 242 Conn. 143, 146–47, 698 A.2d 297 (1997).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, 'we look to the words of the

[13] The state argues, in the alternative, that the defendant had actual knowledge of her license suspension as a result of having received a temporary operator's license pursuant to § 14-227b (c). Because we conclude that actual knowledge is not required, and because no evidence of a temporary license was introduced at trial, we do not address the state's alternate argument.

[14] On September 13, 1996, the defendant filed a written request to charge requesting that the trial court include the element of knowledge of suspension in its instructions. See footnote 9 of this opinion. The request was denied on the same day. The defendant also excepted to the jury charge immediately after it was given. Thereafter, during the court trial on the issue of the enhanced penalty, the defendant moved for judgment of acquittal and for a new trial based on the court's refusal to instruct on knowledge as an element of the crime. These motions were denied. Moreover, during the sentencing hearing, the defendant further elaborated on her claim that knowledge is a required element for a violation of § 14-215 (a).

statute itself, to the legislative history and circumstances surrounding its enactment, [and] to the legislative policy it was designed to implement . . . .' " *United Illuminating Co.* v. *New Haven,* 240 Conn. 422, 431, 692 A.2d 742 (1997). Based on the language of § 14-215, its legislative history and the circumstances surrounding its enactment, and the policy it was designed to implement, we conclude that actual knowledge of a license suspension is not an essential element of the crime of operating a motor vehicle with a suspended license.[15]

---

[15] "There is a wide split of authority on the question whether driving with a suspended license requires proof of intent." *State* v. *McCallum,* 321 Md. 451, 455, 583 A.2d 250 (1991), quoting *Zamarripa* v. *First Judicial District Court,* 103 Nev. 638, 641, 747 P.2d 1386 (1987). We join those jurisdictions that do not require criminal intent or knowledge for a conviction for driving with a suspended license. See *People* v. *Morrison,* 149 Ill. App. 3d 282, 284, 500 N.E.2d 442 (1986), cert. denied, 482 U.S. 915, 107 S. Ct. 3187, 96 L. Ed. 2d 675 (1987) (elements of driving while driver's license is revoked are act of driving motor vehicle and fact that driver's license was revoked); *State* v. *Carmer,* 465 N.W.2d 303, 304 (Iowa App. 1990) (knowledge is not element of driving while license is suspended); *State* v. *Jones,* 231 Kan. 366, 368, 644 P.2d 464 (1982) (for conviction of misdemeanor of driving with suspended license, state must send copy of order of suspension but need not prove actual receipt of notice or actual knowledge of suspension; nonreceipt may be mitigating factor at sentencing); *State* v. *Pickering,* 432 So. 2d 1067, 1071 (La. App. 1983) (scienter not required for conviction for driving without license; state need only demonstrate that defendant drove vehicle on highway without proper license); *State* v. *Coady,* 412 N.W.2d 39, 41 (Minn. App. 1987) (offense of driving after license revocation does not require actual receipt of notice); *State* v. *Grotzky,* 222 Neb. 39, 42, 382 N.W.2d 20 (1986) (felony of operating motor vehicle after license revoked does not require intent); *State* v. *Buttrey,* 293 Or. 575, 582–84, 651 P.2d 1075 (1982) (defendant sentenced to one year imprisonment for driving with suspended license; state not required to prove knowledge by defendant of license suspension; defendant has statutory affirmative defense of nonreceipt); *State* v. *Chicoine,* 154 Vt. 653, 580 A.2d 970 (1990) (actual notice of suspension not required; state must only send notice of suspension by registered or certified mail); but see *Jeffcoat* v. *State,* 639 P.2d 308, 313 & n.4 (Alaska App. 1982) (state must show actual knowledge or deliberate conduct calculated to avoid receipt of notice on part of defendant); *People* v. *Lesh,* 668 P.2d 1362, 1365 (Colo. 1983) (under statute proof of mailing is only prima facie proof and does not create conclusive presumption; state must prove knowledge of license revocation); *State* v. *Keihn,* 542 N.E.2d 963, 968 (Ind. 1989) (state

We begin with the language of the statute itself. *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 102, 680 A.2d 1321 (1996). Section 14-215 (a) provides that "[n]o person . . . whose operator's license . . . has been suspended . . . shall operate any motor vehicle during the period of such . . . suspension . . . ." Section 14-111 (a) provides that a suspension notice will be sent "by bulk certified mail to the address of the person registered as owner or operator of any motor vehicle as shown by the records of the commissioner . . . ." The language of § 14-111 (a) plainly provides that this method *"shall be sufficient notice to such person that the . . . operator's license is . . . under suspension."* (Emphasis added.) Nowhere in §§ 14-215 or 14-111 do the words "knowledge" or "actual notice" appear, which the defendant wishes to find. Although the statute does not expressly require knowledge, the absence of the term is not dispositive, however, because we previously have reasoned that "[t]he omission of the word 'knowingly' is not conclusive upon the question whether, to secure a conviction, the prosecution must prove that the accused knew that [her license was suspended]. Many statutes defining crimes do not contain the word 'knowingly' or its equivalent. . . . Whether knowledge is a necessary element in proving that a prohibited act is a crime is a matter of legislative intention." (Citations omitted.) *State* v. *Sul*, 146 Conn. 78, 86, 147 A.2d 686 (1958). The *absence* of any specific language regarding knowledge, coupled

---

must prove defendant's knowledge of license suspension in prosecution for driving with suspended license even though statute is silent on whether knowledge is required; proof of mailing of notice gives inference of knowledge); *State* v. *Lewis*, Kansas Supreme Court, Docket No. 75375 (January 30, 1998) (knowledge of status is essential element of felony of driving while habitual offender); *State* v. *McCallum*, supra, 457 (driving with suspended license is not public welfare offense; mens rea required); *State* v. *Collova*, 79 Wis. 2d 473, 485–86, 255 N.W.2d 581 (1977) (severity of penalty led court to conclude state must prove defendant knew or had reason to know driver's license was revoked).

with the *presence* of language tending to equate bulk mailing with notice, strongly suggests that knowledge of suspension is not an essential element of the offense.

We next turn to legislative history and policy. "While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime,[16] and this was followed in regard to statutory crimes, even where the statutory definition did not in terms include it . . . [t]he legislature may, if it so chooses, ignore the common-law concept that criminal acts require the coupling of the evil-meaning mind with the evil-doing hand and may define crimes which depend on no mental element, but consist only of forbidden acts or omissions. *State* v. *Husser*, 161 Conn. 513, 515, 290 A.2d 336 (1971). Whether or not a statutory crime requires mens rea or scienter as an element of the offense is largely a question of legislative intent to be determined from the general scope of the act and from the nature of the evils to be avoided. [Id.]; *State* v. *Gaetano*, 96 Conn. 306, 316, 114 A. 82 (1921)." (Citation omitted; internal quotation marks omitted.) *State* v. *Kreminski*, 178 Conn. 145, 148–49, 422 A.2d 294 (1979).

"[T]here are many instances where the requirement of criminal intent has been omitted from police regulatory or public welfare statutes." Id., 149. "There are many statutes in the nature of police regulations for

[16] There is a presumption of mens rea in those crimes having their origin in the common law. *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 437, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978). "[M]ere omission . . . of intent [in the statute] will not be construed as eliminating that element from the crimes denounced; instead Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor, and absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them." (Internal quotation marks omitted.) Id. Because the crime of driving with a suspended license does not have its origins in the common law, the defendant is not entitled to this presumption.

the protection of the morals of the community . . .
under which, either because it is impracticable to . . .
prove knowledge, or because it is regarded as reason-
able under the circumstances that the doer of the act
should take the risk of knowing the facts, it is generally
held that the prohibited act is criminal, notwithstanding
the ignorance of the accused." (Internal quotation
marks omitted.) *State* v. *Gaetano*, supra, 96 Conn. 316;
see *State* v. *Kreminski*, supra, 178 Conn. 149 ("there
is a growing recognition that regulatory legislation may
exclude the conventional requirement of awareness of
wrongdoing for criminal conduct by placing the burden
of acting at hazard upon a person otherwise innocent
but standing in responsible relation to a public danger"
[internal quotation marks omitted]). "Intent to do the
prohibited act, not intent to violate the criminal law, is
the only intent requisite for conviction in the case of
many crimes constituting violations of statutes in the
nature of police regulations. *State* v. *Gaetano*, [supra,
316], and cases cited; *State* v. *Sul*, [supra, 146 Conn.
86]." (Internal quotation marks omitted.) *State* v. *Hus-
ser*, supra, 161 Conn. 516.

"The touchstone is not the reprehensibility of the
offender but the nature of the evils to be avoided, and
the extent of the probable frustration of the regulatory
scheme which a requirement of scienter would create.
. . . Personal blame on the part of the actor, except
in the general sense that he should have known better
or exercised a greater degree of care, is not a necessary
element of many offenses where protection of the pub-
lic against the harm which would result in the absence
of regulation is the principal legislative concern. . . .
[P]ublic policy may require that in the prohibition or
punishment of particular acts it may be provided that
he who shall do them shall do them at his peril, and
will not be heard to plead in defense good faith or
ignorance." (Citations omitted; internal quotation

marks omitted.) *State* v. *Kreminski*, supra, 178 Conn. 150–51.

"There is a suggestion in some of the early cases dealing with police regulatory legislation not requiring any criminal intent that the penalties must be 'petty' and not involve imprisonment. . . . The question left undecided in those cases, whether a provision for imprisonment necessarily implied a requirement of mens rea, has long been resolved in favor of the view that the abandonment of the element of intent depends upon the 'peculiar nature and quality of the offense' and whether the penalty serves as an effective means of regulation." (Citations omitted.) Id., 152.

In Connecticut, the legislature has promulgated "an unambiguous policy aimed at ensuring that our highways are safe from the carnage associated with drunken drivers." *State* v. *Stevens*, 224 Conn. 730, 739, 620 A.2d 789 (1993); see *State* v. *Hickam*, 235 Conn. 614, 624–25, 668 A.2d 1321 (1995), cert. denied, 517 U.S. 1221, 116 S. Ct. 1851, 134 L. Ed. 2d 951 (1996); *State* v. *Boisvert*, 40 Conn. App. 420, 428, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996). "The legislature enacted the statutes governing the operation of motor vehicles, including § 14-111, for the protection of the lives and property of the citizens of this state. In matters concerning public safety, the legislative department in the use of its police power is the judge, within reasonable limits, of what the public welfare requires." (Internal quotation marks omitted.) *Hickey* v. *Commissioner of Motor Vehicles*, 170 Conn. 136, 139, 365 A.2d 403 (1976).

It is clear that, when enacting § 14-215, the legislature was concerned with "the amount of casualties, fatalities, and injuries that are occurring repeatedly in the State. Many of these [drivers], when they are under the influence, are nothing but killers, legalized killers." 26

H.R. Proc., Pt. 19, 1983 Sess., p. 6685, remarks of Representative Eugene A. Migliaro, Jr.[17] The medical community shared similar concerns. "They voted unanimously to support effective legislation aimed at control of drivers operating vehicles while intoxicated. They are urging this Legislature to view such behavior as a serious threat to public health and safety and in so doing to take decisive steps to control and eradicate it." Id., p. 6688, remarks of Representative Martha D. Rothman. Representative Robert C. Sorensen indicated a need "to counteract the carnage that we're seeing on the highways caused by drunk driving. . . . I think it's time that we take a very strong stand in that area." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1983 Sess., pp. 194–95.

In discussing an amendment to § 14-215 to institute a five day mandatory minimum term of imprisonment, Senator James J. Murphy stated that "[o]ne of the problems that we have had through the years in addressing the drunk driving statute is that every time we kind of toughen it out, toughen it up or do something that's necessary, we find that there are people who continue to drive with impunity and, in fact, go into the courtrooms, they drive while they're under suspension, pay a hundred and a hundred and fifty dollar fine and keep going back out. . . . So that we have these drivers who are charged, convicted of serious motor vehicle offenses, i.e., driving while intoxicated, manslaughter in the second degree or with underlying circumstances of drunk driving convictions or involved with the excessive use of alcohol that has resulted in the death of another, they take the suspension and just continue on out driving with impunity . . . ." 26 S. Proc., Pt. 13,

---

[17] See 32 S. Proc., Pt. 12, 1989 Sess., p. 3979, remarks of Senator Anthony V. Avallone ("[W]e will not tolerate drunken drivers on our roads. . . . [W]e will not tolerate the carnage, the loss of life and property on our roads as a result of drunken drivers.").

1983 Sess., p. 4421. In 1985, during a proposed amendment to increase the mandatory minimum term of imprisonment for driving with a suspended license to thirty days, Representative Thomas Dudchik stated that this bill "[gets] the message out that this legislature means business when it comes to drunk driving. . . . It is clear that drunk driving is one of the most serious hazards of our age, and it is largely preventable. This legislation . . . will make the punishment fit the crime of jeopardizing the lives of others . . . ." 28 H.R. Proc., Pt. 19, 1985 Sess., pp. 7030–31.

A principal purpose for the enactment of § 14-215 was to protect the safety of the public by eliminating the threat of drunk drivers. The legislature was gravely concerned with enforcing license suspensions in order to prevent those individuals who have had their licenses suspended from "driving with impunity." The legislature has constructed two levels of sanctions that correspond to the severity of the underlying reason for a license suspension. Those reasons that are more threatening to the safety of the public, such as failing a chemical alcohol test,[18] result in more severe sanctions, namely, a mandatory minimum of thirty days imprisonment and a $500 fine. It is axiomatic that driving while intoxicated is a dangerous activity and is harmful to the welfare of the public. Because this is a public welfare statute aimed at regulating drunk drivers and protecting the safety of the public, it is reasonable to impose upon a driver who has previously failed a chemical alcohol test the burden of knowing the facts and limitations associated with that failure. See *State* v. *Gaetano*, supra, 96 Conn. 316. Such a driver bears the risk of acting in a responsible manner. See *State* v. *Kreminski*, supra, 178 Conn. 149.

---

[18] Other reasons that are more threatening to the safety of the public include driving while under the influence of intoxicating liquor or any drug, manslaughter in the second degree with a motor vehicle, and assault in the second degree with a motor vehicle. See General Statutes § 14-215 (c).

In 1979, § 14-111 (a) was amended to change the notice requirement for license suspensions from registered or certified mail to bulk certified mail.[19] There is no indication in the legislative history that, following this amendment, actual knowledge of a license suspension would be required. When asked "how important is it to your department to have knowledge that these are actually received," the commissioner of the department of motor vehicles, Benjamin Muzio, responded, "[i]f it's a suspension notice, we indicate that they will be suspended within a certain period of time if they failed to file an accident report. Normally we send out one letter and then we send out a second letter of suspension. It's important to that individual that he receive it, but based on the number of refusals to pick up certified mail, I don't think it's going to make a great deal of difference." Conn. Joint Standing Committee Hearings, Transportation, Pt. 1, 1979 Sess., p. 99. We do not find Muzio's comment that it is important to an individual that he or she receive a letter of suspension tantamount to a requirement of actual knowledge. We do not dispute that it is important to have notice. We conclude, however, that the defendant bears the burden of knowing the limitations associated with having failed a chemical alcohol test, and that, once the bulk mailing requirement has been satisfied, it is therefore reasonable to presume that the defendant had notice of her license suspension. See *State* v. *Kreminski*, supra, 178 Conn. 150–51.

The defendant argues that a violation of § 14-215 (a) requires actual knowledge of the suspension because of the severe penalties imposed. She cites as support

---

[19] The primary reason for the amendment was the fiscal savings to the state that would result by changing the method of notice delivery. See 22 S. Proc., Pt. 1, 1979 Sess., p. 268; 22 H.R. Proc., Pt. 17, 1979 Sess., p. 5873; Conn. Joint Standing Committee Hearings, Transportation, Pt. 1, 1979 Sess., pp. 88, 97–98.

the concurring opinion in *Yanni* v. *DelPonte*, 31 Conn. App. 350, 357–58, 624 A.2d 1175 (1993), wherein Judge Lavery stated that "the notice requirement of General Statutes § 14-227b (g) could be crucial in a criminal procedure context. . . .   Whether and when a person received notice of suspension would be crucial to that person's defense were that person to face the severe sanctions provided by § 14-215." (Citations omitted; internal quotation marks omitted.) We conclude that the penalty for a violation of § 14-215 (a), where the underlying reason for the suspension was a violation of § 14-227b, is not unreasonable. See *State* v. *Kreminski*, supra, 178 Conn. 153 (sentence imposed of 150 days imprisonment with execution suspended, probation for one year and fine of $5000 was not disproportionate to crime involved). We view this penalty of a mandatory minimum period of thirty days imprisonment as an effective method to shield the public from individuals who continue to drive, possibly while intoxicated or impaired, in spite of license suspensions and fines, and to deter those individuals from driving. See id., 152.

There are other instances in which a criminal conviction does not require proof of actual knowledge.[20] In *State* v. *Gaetano*, supra, 96 Conn. 306, we reasoned that actual knowledge is not an essential element of the offense of keeping a house of ill fame in violation of General Statutes (1918 Rev.) § 6384. Id., 316. We concluded that because this act was "a police regulation

---

[20] The United States Supreme Court has determined that actual knowledge is not required in certain instances. In *United States* v. *Balint*, 258 U.S. 250, 253, 42 S. Ct. 301, 66 L. Ed. 604 (1922), the court concluded that knowledge of the character of a drug is not a required element in a violation of the Narcotic Act. The court found that the purpose of this act was to protect innocent purchasers from the danger of certain drugs and thus "require[d] every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him." Id., 254; see *State* v. *Kreminski*, supra, 178 Conn. 150–51.

for the protection of the morals of the community . . . it [was] reasonable to require that whoever . . . keeps a house which is a house of ill fame should take the risk of knowing the facts." Id., 316–17. Similarly, we determine that § 14-215 is a statute in the nature of a police regulation whose purpose is to protect the safety of the public. It is therefore reasonable to require that whoever chooses to drive after an arrest for driving under the influence and failure of a chemical alcohol test, and who has been sent notice of suspension by bulk certified mail, should take the risk of knowing the facts and circumstances of his or her driving status.

In *State* v. *Kreminski*, supra, 178 Conn. 148, we concluded that scienter or knowledge of a licensing requirement is not required in a conviction for violating General Statutes (Rev. to 1977) § 36-334, which prohibits the sale of securities by unlicensed persons. We reasoned that "[a]lthough protection of the financial interest of the public may not be as paramount as safeguarding its health and morals by suppressing activities which endanger those interests, nevertheless, it is a matter of serious concern and the legislature might reasonably have concluded that strict criminal liability was appropriate." Id., 151–52. The present case entails those paramount public health and safety interests that call for omitting proof of actual knowledge for conviction.

In *State* v. *Denby*, 235 Conn. 477, 482, 668 A.2d 682 (1995), we concluded that specific intent to sell narcotics at a location within 1000 feet of a school is an essential element of the crime of possession of narcotics with intent to sell within 1000 feet of a school in violation of General Statutes (Rev. to 1991) § 21a-278a (b),[21] but that knowledge that the particular location is

---

[21] In *State* v. *Denby*, supra, 235 Conn. 482, we determined that "the plain language of § 21a-278a (b) requires as an element of the offense an intent to sell or dispense the narcotics at a location that is within 1000 feet of a school."

within 1000 feet of a school is not required. We reasoned that "[§] 21a-278a (b) specifically requires a mental state of 'intent,' which must be applied to every element of that statute. The mental state of knowledge that the location is within the 1000 foot zone is not set forth in § 21a-278a (b). An 'intent' element is not synonymous with a 'knowledge' element, each of which is specifically defined in the penal code. *The absence of any statutory requirement that the defendant knowingly sell within the prohibited school zone demonstrates that the legislature did not intend to make knowledge an element of the crime.* If the legislature had wanted to make actual knowledge as to location of a school an element of the offense, it would have done so by specifically stating that the defendant possessed the narcotics with the intent to sell or dispense at a location that the defendant knew was in, or on, or within 1000 feet of a school." (Emphasis added.) Id., 482–83. Similarly, if the legislature had wanted to make actual knowledge of a license suspension an element of the offense of driving with a suspended license, it clearly could have done so.[22]

We conclude that the language of the statute, the legislative history and the legislative purpose evince a

---

[22] In contrast, in *State* v. *Sul*, supra, 146 Conn. 78, this court concluded that knowledge that the material is obscene or indecent is an essential element of the crime of "[possessing] with intent to sell . . . offer or show, any book [or] pamphlet . . . containing obscene, indecent or impure language, or any picture . . . of like character . . . ." Id., 80 n.1. This court reasoned that although the statutory definition of the crime does not contain the word "knowingly," because the "purpose of the statute is to prevent the selling, showing or offering of obscene or indecent material falling within the description stated . . . [i]t must be assumed that the legislature was aware that such material was likely to be sold, offered or shown by one who knew from its nature that it would have an appeal to prurient interests." Id., 87. The court further reasoned that because this statute requires proof of intent, "it is the obvious intendment of the legislature that the word 'intent' should imply knowledge that the material is, in fact, obscene or indecent." Id. Section 14-215, in contrast, does not contain an element of intent, nor is it necessary to assume that the legislature wanted to impose the element of knowledge in light the legislature's public policy goals.

legislative intent not to require actual knowledge of a license suspension for a violation of § 14-215 (a). Proof of mailing in accordance with § 14-111 (a),[23] along with proof that the defendant was operating a motor vehicle on a public highway in Connecticut while her operator's license was suspended, is sufficient for a conviction under § 14-215 (a).

The judgment is affirmed.

In this opinion BORDEN, KATZ and MCDONALD, Js., concurred.

CALLAHAN, C. J., concurring. Although I agree with the result of the majority opinion, I do not agree that the legislative history of Public Acts 1983, No. 83-534, which involved the overhaul of Connecticut's drunk driving laws, is relevant to the issue of whether General Statutes § 14-215 (a) requires that one have actual knowledge that her license has been suspended before she may be prosecuted for driving with a suspended license. The language of § 14-215 (a) has been on the books in essentially its present form since at least 1930. See General Statutes (1930 Rev.) § 1591.[1] I therefore disagree with the majority's assertion that the meaning

___

[23] The state produced at trial evidence of conformity with § 14-111 (a) in the form of two documents. The jury reasonably could have found that these documents, a copy of the suspension notice and the certificate of mailing, sufficiently proved compliance with § 14-111 (a). See *State* v. *Torma,* supra, 21 Conn. App. 502–504.

[1] General Statutes (1930 Rev.) § 1591 provided: "Operation while registration or license is suspended. No person to whom an operator's license shall have been refused, or whose operator's license or whose right to operate a motor vehicle in this state shall have been suspended or revoked, shall operate any motor vehicle during the period of such refusal, suspension or revocation. No person shall operate or cause to be operated any motor vehicle, the registration of which shall have been refused, suspended or revoked, or any motor vehicle, the right to operate which shall have been suspended or revoked. Any person who shall violate any provision of this section shall be fined not less than one hundred dollars nor more than two hundred dollars or imprisoned not more than ninety days or be both fined and imprisoned."

of that provision, which applies to all license suspensions rather than only to those related to drunk driving, somehow can be informed by the 1983 legislative history of a statute designed to reduce drunk driving.[2] Moreover, General Statutes § 14-111 (a), which directly addresses the notice to be provided in the event of a license suspension and which was amended in *1979* to require only notice by bulk certified mail, has nothing to do with the drunk driving legislation enacted by the legislature in *1983*.

I concur in the result.

---

[2] Public Acts 1983, No. 83-534, amended § 14-215 only by adding subsection (c), which provided for enhanced penalties when the reason for the initial suspension was driving under the influence. It in no way had any effect on any notice requirements.

